735 N.E.2d 1058 (2000)
316 Ill. App.3d 193
249 Ill.Dec. 233
In re B.J., B.J., and J.J., Alleged to be Neglected Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Dale Johnson, Respondent-Appellant.)
No. 4-00-0203.
Appellate Court of Illinois, Fourth District.
September 7, 2000.
*1060 Robert M. Travers (argued), Fellheimer Law Firm, Ltd., Pontiac, for Dale Johnson.
Charles G. Reynard, State's Attorney, Bloomington, Norbert J. Goetten, Director, Robert J. Biderman, Deputy Director, James C. Majors, Staff Attorney (argued), State's Attorneys Appellate Prosecutor, Springfield, for the People.
Jon E. McPhee, Assistant Public Defender (Court-appointed), Bloomington, Guardian Ad Litem, for B.J.
Justice GARMAN delivered the opinion of the court:
In November 1999, after an adjudicatory hearing, the trial court found respondent father, Dale Johnson, had exposed the minors B.J., B.J., and J.J. to an injurious environment. 705 ILCS 405/2-3(1)(b) (West 1998). Therefore, the court adjudicated the minors neglected and placed them in their mother's custody until after the dispositional hearing. In its December 1999 dispositional order, the court made the minors wards of the court, gave full legal and physical custody to the minors' mother and, at the discretion of the Department of Children and Family Services (DCFS), granted respondent supervised visitation. Respondent appeals, arguing that (1) the trial court's finding of neglect and subsequent dispositional order were contrary to the manifest weight of the evidence and (2) the trial court erred by refusing to consider testimony from respondent's psychologist concerning J.J.'s credibility and respondent's character. We affirm.

I. BACKGROUND
Respondent married Ellen Golden (formerly Ellen Johnson) in October 1986. The couple had three children, B.J., B.J., and J.J. (born April 19, 1990; June 22, 1991; and July 21, 1993, respectively) before divorcing in May 1994. Ellen retained custody of the children with respondent getting visitation every other weekend and one day during the week.
In March 1999, the State filed a petition for adjudication of wardship of B.J., B.J., and J.J., alleging that respondent sexually molested J.J. and therefore neglected all three children by exposing them to an environment injurious to their welfare. 705 ILCS 405/2-3(1)(b) (West 1998).
At the September 1999 hearing on the petition, Ellen Golden testified that, since *1061 he was around two years old, J.J. had exhibited unusual bathroom habits. Golden indicated that J.J. did not "use" the bathroom but would "soil" himself. Further, she would periodically catch J.J. crossing his legs and trying to "hold it." She testified that, at its worst, J.J. soiled himself three to four times per day. Golden said that two to three times a week J.J. inexplicably urinated in closets or on the floor of his bedroom. Golden talked with J.J. frequently about his bathroom habits, but J.J. always said that he did not know why he soiled himself and urinated on the floor.
Golden recalled an October 1998 conversation with J.J. (who was then five years old) during which J.J. told his mother that he was scared to go to the bathroom. He said that there were things in the bathroom that made him afraid. J.J. told her that respondent had touched his "private part." Golden stated that she gave J.J. a doll and asked him to point on the doll to where respondent had touched him. She said J.J. pointed to between the doll's legs. Golden testified that J.J. said the "touching" happened "a lot" when they stayed at respondent's house. Upon hearing this, Golden called J.J.'s school and asked John McKittrick, a counselor, to speak with J.J.
McKittrick testified that Golden called him in October 1998 and asked him to talk to J.J. about J.J.'s unusual bathroom habits, which usually occurred after he returned from visiting his father. McKittrick said Golden did not explicitly tell him that she suspected respondent of molesting J.J. McKittrick said J.J. never actually told him that respondent had touched him inappropriately; however, J.J. did indicate that his dad was doing something scary to him while he was using the bathroom. Using a doll, McKittrick asked J.J. to show him what was happening in the bathroom. J.J. pointed to an area between the doll's legs. McKittrick said J.J. was visibly emotional during the conversation and had "tears running down his face."
Judy O'Brien, a child protective investigator for DCFS, testified that she met with and interviewed J.J. at his mother's house on October 22, 1998. After some general discussion about the difference between "good touches" and "bad touches," O'Brien asked J.J. if anybody had ever touched his private parts. J.J. said that his father had touched his private parts. O'Brien explained to J.J. the importance of telling the truth about such matters. O'Brien said J.J. initially dropped his head and said that it was not true, but then immediately burst into tears and said that it was true. J.J. said it would happen when he visited his dad at his house.
O'Brien further testified that J.J., along with his two siblings, were interviewed at the Children's Advocacy Center (Center) on October 27, 1998. O'Brien said she, Mike Stroh from the State's Attorney's office, Detective Dan Fevor, and Center coordinator Mary Whitaker were present during the interview. O'Brien said that J.J. seemed very uncomfortable; to almost every question, J.J. responded "I don't know" or "I don't remember." Further, J.J. would hide his face in a pillow or lay on the floor in a fetal position. As a result, O'Brien stated that they temporarily ended J.J.'s interview and talked with his two siblings. Both siblings denied having been touched by anyone in a sexual or other inappropriate manner. When they resumed their conversation with J.J., he seemed slightly more relaxed and admitted that respondent had touched his "privates" more than once. J.J. also stated that he had seen respondent do the same thing to his siblings.
During the hearing, the court listened to the audio recording of this interview and reviewed the written transcripts. At the State's request, the court later admitted the transcript into evidence.
Sexual abuse therapist Jennifer J. Aranda testified that, in spring 1999, she counseled J.J. and his two siblings regarding respondent's alleged sexual abuse. Aranda explained that children who are *1062 sexually abused sometimes exhibit physical manifestations. Such manifestations can include enuresis (inability to control one's bladder function) and encopresis (inability to control one's bowel movements). Further, Aranda said that sexually abused children often exhibit emotional signs of abuse. The variety of characteristics therapists typically look for include acting extremely aggressive, depression, acting out sexually, and/or having low self-esteem. Aranda testified that J.J. was often withdrawn and appeared to have low self-esteem. Further, Aranda indicated that J.J.'s history included bouts of aggression.
J.J. testified in camera at the hearing. When asked whether respondent had ever done anything that made him sad, J.J. responded "yes." After being asked what respondent did that made him sad, J.J. pointed down toward his pants. Later on, J.J. admitted that respondent had touched his "private area" and nodded his head up and down in response to being asked whether respondent ever hurt him by touching him. Additionally, in response to questions from the court, J.J. indicated that when respondent touched his private area, respondent was not trying to clean him up but was cooking dinner. J.J. further said that it "felt bad" when respondent touched him and that it hurt. However, J.J. said that respondent only touched him inappropriately on one occasion.
Dr. Larry Sapetti testified that he examined J.J. in November 1998. Although Sapetti stated that he examined J.J. only once, other doctors in his practice had examined J.J. since his initial visit in January 1997. Sapetti further testified that, at that time, J.J. was having problems related to enuresis and encopresis. The doctor noted that J.J.'s history indicated that another physician had previously treated him for constipation. Additionally, Sapetti commented that sexually abused children sometimes exhibited, among other things, a regression in toilet training behavior. Sapetti said that encopresis and enuresis can also be caused by a number of physical illnesses including diabetes, hormone abnormalities, cystic fibrosis, Hirschsprung's diseases, and undetected infections. However, Sapetti said that tests performed on J.J. did not indicate a physical cause for his toilet training regression problems. Sapetti also noted that he performed a visual examination of J.J.'s genitals and anus and saw no evidence of skin tears or scarring. Sapetti further noted that stress can sometimes cause encopresis and enuresis. Events such as the birth of a sibling and starting school can sometimes cause toilet training regression. Sapetti also agreed that asthma attacks, from which J.J. periodically suffered, could be very stressful to a child.
Detective Dan Fevor testified that, after the allegations of abuse, he interviewed respondent at the McLean County sheriff's department. Fevor said respondent denied the allegations and was "in the dark" about the allegations. Although recalling no incident or activity that J.J. might have mistaken for an inappropriate touching, respondent conceded that he would jokingly warn J.J., when he misbehaved, that he was going to "snip" his penis off. Respondent said that he would display a cutting motion with his fingers when giving J.J. this warning. Fevor said that about halfway through the interview, respondent began shaking and started to cry.
During his case in chief, respondent testified that he did not sexually abuse his children. However, respondent admitted that during 1997 DCFS suspended his visitation rights with J.J. and his siblings, due to an incident in which respondent spanked J.J. hard enough to leave marks. Respondent said that he administered the spanking after J.J. urinated on the wall of the bathroom and soiled his pants.
Michael Lype testified that he and Ellen Golden (then Johnson) lived together for about five years beginning in 1993 and ending around 1997. Lype said J.J. was about six or seven months old when he and Ellen moved in together. Lype recalled *1063 that, beginning around age two, J.J. began having bowel and urinary problems. J.J. would soil his pants and appeared to try and prevent bowel movements from occurring. In addition, J.J. would urinate in the corner of his bedroom. Lype further stated that while he and Ellen lived together, J.J. never complained to him that respondent had touched him inappropriately. However, Lype did say that when J.J. visited respondent, J.J.'s bowel and urinary problems seemed to increase.
Dr. Melvin French, a clinical psychologist, testified that outside of physical causes or poor toilet training by the parents, encopresis and enuresis are typically caused by psychological factors related to situational or environmental stress. For a child of J.J.'s age, such stresses could include starting school, relocation, changes to the family system, domestic violence, or the birth of new siblings. However, he admitted that encopresis and enuresis can also be caused by sexual abuse. In reviewing J.J.'s history, Dr. French noted that J.J. had undergone relocation, his mother had remarried a man who brought children of his own to the new home, and J.J. had recently started school. Further, Dr. French noted that, after her divorce from respondent and prior to marrying her current husband, J.J.'s mother, Ellen, lived with a man who had physically shoved her in J.J.'s presence on at least one occasion.
Respondent also sought to have Dr. French testify that J.J. was not a credible witness and that respondent did not fit the profile of a sex offender. The State filed a motion in limine seeking to bar Dr. French's testimony in this regard. The court granted the State's motion but allowed respondent to make an offer of proof.
During the offer of proof, Dr. French testified that the State presented no "strong credible evidence of childhood sexual abuse." Furthermore, Dr. French stated that J.J. was not a credible witness because of the coercive nature of the interview process employed at the Center. Finally, Dr. French concluded that DCFS "failed to pursue other explanations," noting that DCFS workers, in a December 1998 report, stated that "this is not a very strong case." Dr. French further testified that the psychological tests he performed on respondent did not indicate that respondent suffered from any severe psychopathology, including those relating to sexual behavior and alcoholism. The court elected to stand on its original decision to bar Dr. French's testimony regarding J.J.'s credibility and any "profiling" evidence regarding respondent as a sex offender. The court noted that the testimony regarding J.J.'s credibility invaded the province of the fact finder and that case law clearly indicated that "profiling" testimony was not admissible.
In November 1999, at the conclusion of all the evidence, the trial court found that the State had proved its petition and adjudicated all three minors neglected. In reaching its decision, the court remarked that, in its opinion:
"[C]onsistent statements were given by the [m]inor, that he was touched in his private area by his father, and * * * the [c]ourt notes * * * a consistency about these statements to a number of different people, including in chambers. * * * [T]he [c]ourt believes based on all the evidence[,] that by a preponderance of the evidence * * * some touching in the sexual area has occurred[.] * * * [T]his created an environment * * * injurious as related to the child's sexuality."
In December 1998, the court, in its dispositional order, granted Ellen Golden full custody of all three minors. Further, the court provided respondent supervised visitation, at DCFS' discretion, only after he successfully completes a sex offender evaluation and provided that the children's therapist agrees such visitation is in the minors' best interests. This appeal followed.

*1064 II. ANALYSIS

A. The Trial Court's Conclusions
Defendant first argues that the trial court's finding of neglect and subsequent disposition granting full custody of the minors to Ellen Golden was against the manifest weight of the evidence. With respect to the court's dispositional order, respondent contends that, since the finding of neglect was against the manifest weight of the evidence, the court's subsequent disposition is also against the manifest weight of the evidence. We disagree.
Typically, a circuit court's finding as to whether abuse or neglect occurred will not be disturbed on appeal unless contrary to the manifest weight of the evidence. In re A.P., 179 Ill.2d 184, 204, 227 Ill.Dec. 949, 688 N.E.2d 642, 652 (1997). This standard is appropriate given that the trial court is in a far better position than this court to assess the credibility of the witnesses and weigh the evidence. In re T.B., 215 Ill.App.3d 1059, 1062, 158 Ill.Dec. 780, 574 N.E.2d 893, 896 (1991). A reviewing court will not overturn the trial court's findings merely because the reviewing court might have reached a different conclusion. T.B., 215 Ill.App.3d at 1062, 158 Ill.Dec. 780, 574 N.E.2d at 896.
In this case, J.J. testified, in camera, admitting that respondent touched his "private area" and that it "felt bad" when he did so. Ellen Golden and Judy O'Brien each testified that J.J. personally told them that respondent had touched him inappropriately, and, according to McKittrick, J.J. indicated respondent was doing something scary to him while he was in the bathroom. Furthermore, Detective Fevor and O'Brien said that, during an interview at the Center, J.J. again stated that respondent had touched him inappropriately on more than one occasion and, in addition, had done the same to B.J. and B.J. The court considered not just these people's testimony regarding the interview, but actually listened to a tape recording of the interview and reviewed the written transcripts. Further, on at least three different occasions, when asked, J.J. pointed to an area between a doll's legs to indicate where respondent had touched him.
In addition, more than one witness testified that J.J.'s problems with encopresis and enuresis could be caused by sexual abuse. While Dr. Sapetti testified that there are other causes besides sexual abuse, he stated that, after running several tests, he found no physical cause for J.J.'s toilet training regression problems. Finally, respondent admitted that he had previously physically abused J.J. and had, as a result, lost his visitation privileges for about a year. Although the State presented scant evidence regarding respondent's abuse of B.J. and B.J., where a trial court finds that the minors' environment is injurious, it need not wait until each child becomes a victim or is emotionally damaged in order to remove the child from the household. T.B., 215 Ill.App.3d at 1062-63, 158 Ill.Dec. 780, 574 N.E.2d at 896. Parents have a duty to protect their children from harm, and their failure to provide a safe and nurturing shelter clearly falls within the concept of statutory neglect. In re M.K., 271 Ill.App.3d 820, 826, 208 Ill.Dec. 242, 649 N.E.2d 74, 79 (1995). Given that J.J. consistently identified respondent as the one who touched him, he told several different people the same thing at different times, the witnesses' corroboration of J.J.'s in camera testimony, and the lack of a medical explanation for J.J.'s toilet training regression problems, we conclude that the trial court's finding that all three minors were neglected by virtue of being exposed to an environment injurious to their welfare was not against the manifest weight of the evidence.
Respondent also urges us to find that the trial court's dispositional order was against the manifest weight of the evidence. Contrary to respondent's assertion, the correct standard of review is whether the trial court abused its discretion in fashioning an appropriate disposition. *1065 T.B., 215 Ill.App.3d at 1062, 158 Ill.Dec. 780, 574 N.E.2d at 896. We also point out that respondent presented no case law on this issue and, in fact, made no arguments at all, as required by Supreme Court Rule 341(e)(7) (177 Ill.2d R. 341(e)(7)). Rather, respondent asserted that the trial court erred and deferred to the arguments that he presented regarding the trial court's finding of neglect. Given that the trial court's findings of neglect were not against the manifest weight of the evidence, its subsequent decision to grant custody of the three minors to their mother, Ellen Golden, and grant respondent supervised visitation, at DCFS' discretion, was not an abuse of discretion.

B. Dr. French's Testimony
Respondent contends that the trial court erred by granting the State's motion to prohibit Dr. French from testifying that J.J. was not a credible witness and that respondent did not fit the profile of a sex offender. Typically, a trial court should allow expert testimony only if (1) the proffered expert has knowledge and qualifications uncommon to laypersons that distinguish him as an expert; (2) the expert's testimony would help the fact finder understand an aspect of the evidence that it otherwise might not understand, without invading the province of the fact finder to determine credibility and assess the facts of the case; and (3) the expert's testimony would reflect generally accepted scientific or technical principles. People v. Simpkins, 297 Ill.App.3d 668, 681, 231 Ill.Dec. 748, 697 N.E.2d 302, 310 (1998).
During the offer of proof, Dr. French testified that, in his opinion, J.J.'s reports of respondent's abuse were not credible because, during the interview at the Center, the interviewers were too forceful in their approach. Further, Dr. French said that alternative explanations to J.J.'s statements and his toilet training regression problems were not adequately explored. With respect to respondent, Dr. French said that, after conducting "psychological" tests, he got no results indicating that respondent suffered from serious psychopathology, including sexual behavior and alcohol problems.
Although Dr. French was competent to testify about behaviors typically exhibited by sexually abused children, he was not competent to testify as to whether J.J. was a credible witness. See Simpkins, 297 Ill.App.3d at 683, 231 Ill.Dec. 748, 697 N.E.2d at 312. Whether J.J. demonstrated behaviors typically exhibited by sexually abused children constitutes circumstantial evidence for the trier of fact to consider and give such weight as it deems fit. We reaffirm what we said in Simpkins: trial courts should reject the attempt to use purported expert testimony to bolster or attack a witness' credibility. Simpkins, 297 Ill.App.3d at 683, 231 Ill. Dec. 748, 697 N.E.2d at 312.
While concluding that Dr. French could not permissibly testify that J.J.'s testimony was unreliable, he could testify, as an expert, regarding the technique employed by those questioning J.J. Certainly, Dr. French could have disputed the validity of the questioning procedure by which J.J.'s responses were obtained and let the fact finder draw its own conclusions on whether to believe J.J.'s answers; however, by asserting that, due to the faulty testing procedure, J.J. was not a credible witness, he invaded the province of the fact finder.
Moreover, while respondent could have introduced evidence of his good character or personality through "general reputation" evidence, the trial court correctly prohibited him from doing so using the expert personal opinion testimony of Dr. French. People v. Edwards, 224 Ill. App.3d 1017, 1024, 167 Ill.Dec. 54, 586 N.E.2d 1326, 1331 (1992). Generally, opinion testimony is not a proper method of admitting evidence regarding character traits. In re J.M., 226 Ill.App.3d 681, 685, 168 Ill.Dec. 701, 589 N.E.2d 1101, 1104 (1992). In declining to admit this portion *1066 of Dr. French's testimony, the trial court followed existing law; therefore, we can find no abuse of discretion.

III. CONCLUSION
For the reasons stated, we affirm the judgment of the trial court.
Affirmed.
STEIGMANN and KNECHT, JJ., concur.