NO. 4-05-0350      Filed: 3/16/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from |
|      Plaintiff-Appellee, | ) Circuit Court of |
|      v. | ) Adams County |
| ROBERT RANDALL, | ) No. 04CF305 |
|      Defendant-Appellant. | ) |
| | ) Honorable |
| | ) Michael R. Roseberry |
| | ) Judge Presiding. |

_____

JUSTICE McCULLOUGH delivered the opinion of the court:

On October 15, 2004, a jury found defendant, Robert Randall, guilty of attempt (aggravated criminal sexual abuse) (720 ILCS 5/8-4, 12-16(d) (West 2002)). On December 2, 2004, the trial court sentenced him to five years in prison. Defendant appeals, arguing (1) the State engaged in gender discrimination during jury selection, (2) he was denied a fair trial because the jury heard the victim "wailing" outside of the courtroom following her testimony, (3) the court erred by granting the State's motion to exclude testimony that defendant did not exhibit characteristics of a pedophile or that the victim's allegations could have been the result of a vivid dream, and (4) he should have been granted a new trial based on newly discovered evidence that the victim lied. We affirm.

On June 24, 2004, the State charged defendant with aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 2002)). Defendant pleaded not guilty and the matter was set for jury trial. On October 12, 2004, the State filed an amended

information, adding a charge of attempt (aggravated criminal sexual abuse) (720 ILCS 5/8-4, 12-16(d) (West 2002)).  Later, the original aggravated-criminal-sexual-abuse charge was dismissed on the State's motion, and the matter proceeded on only the attempt charge.  Regarding that charge, the State alleged defendant, who was at least 5 years older than the alleged victim, K.S., performed a substantial step toward the commission of aggravated criminal sexual abuse when he committed an act of sexual conduct with K.S., who was at least 13 years of age but under the age of 17.  Specifically, the State alleged defendant knowingly placed his hand on K.S.'s upper thigh and moved it toward her vaginal area.

Prior to trial, the State filed a motion in limine to exclude the testimony of defense witness Dr. Frank Froman, alleging the matters to which he would testify were irrelevant, highly speculative, and would invade the province of the jury.  On October 13, 2004, a hearing on the State's motion was held and defendant presented the testimony of Dr. Froman, who testified (1) he interviewed defendant and saw no indication of pedophilia and (2) K.S.'s allegations could possibly have been the result of a vivid dream.  After considering the evidence presented and the parties' arguments, the trial court granted the State's motion to exclude Dr. Froman's testimony.

On October 14, 2004, defendant's jury trial began.  During jury selection, the State exercised four peremptory challenges.  Defendant objected, arguing the State engaged in

purposeful discrimination because its peremptory challenges were only directed at potential male jurors. The trial court made a preliminary finding of purposeful discrimination and the State was given the opportunity to offer gender-neutral explanations for each of its challenges. The court accepted the State's explanations and concluded it did not engage in purposeful gender discrimination.

During the course of trial, defendant moved for a mistrial, alleging he was prejudiced because the jury heard K.S. "wailing" outside of the courtroom after she finished testifying. The trial court noted K.S. started to cry as she left the court-room and, although it was later reported that she collapsed, the court did not believe the jurors saw that happen. Instead, it determined the occurrence was not disruptive and did not affect the jury. The court denied defendant's motion for a mistrial.

On October 15, 2004, the jury returned a verdict of guilty and the trial court set the matter for sentencing. On November 15, 2004, defendant filed a motion to set aside the jury verdict and for new trial, alleging, in part, that the court erred when it (1) granted the State's motion to exclude Dr. Froman's testimony, (2) denied his motion for a mistrial based on K.S.'s outburst, and (3) determined the State offered gender-neutral explanations for its use of peremptory challenges against only male members of the jury venire. Later, on February 14, 2005, defendant filed an amended motion to set aside the verdict and for a new trial. The amended motion included all of his

previous arguments and added a request for a new trial based on newly discovered evidence. Specifically, defendant alleged he located a witness who, after the trial, "discussed the allegations of the case with [K.S.]" and K.S. admitted she "set up" defendant and "he was in jail for something he did not do."

On December 2, 2004, the trial court sentenced defendant to five years in prison. On December 24, 2004, defendant filed a motion to reconsider his sentence. On April 4, 2005, a hearing was conducted on defendant's amended motion to set aside the verdict and for new trial and his motion to reconsider. During the hearing, defendant presented the testimony of C.P., who testified she attended the same school as K.S. and overheard K.S. tell other students that she got defendant "put away" to get revenge on his stepdaughter, A.J. The court continued defendant's motion to reconsider sentence and the newly discovered evidence issue for further hearing but otherwise denied his amended motion to set aside the verdict and for new trial.

On April 21, 2005, the State presented the testimony of K.S., who denied making the statements testified to by C.P. The trial court stated that, after careful consideration, it found C.P. was not credible. It then denied both the portion of defendant's posttrial motion requesting a new trial based on newly discovered evidence and his motion to reconsider his sentence.

This appeal followed.

On appeal, defendant first contends the trial court

erred when it failed to find the State engaged in gender discrimination during jury selection. Specifically, defendant maintains the State utilized its peremptory challenges to discriminate on the basis of gender and exclude men from his jury. He also contends the court improperly offered a gender-neutral explanation for the State.

In Batson v. Kentucky, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 82-83, 106 S. Ct. 1712, 1719 (1986), the United States Supreme Court held that the equal-protection clause of the fourteenth amendment prohibits racial discrimination during jury selection. In J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 130-31, 128 L. Ed. 2d 89, 98, 114 S. Ct. 1419, 1422 (1994), it extended that holding to include intentional gender-based discrimination.

To prevail when alleging intentional gender discrimination, a defendant must make a prima facie showing that the State exercised peremptory challenges on the basis of gender. People v. Blackwell, 171 Ill. 2d 338, 348, 665 N.E.2d 782, 786 (1996). If the requisite showing is made, "the burden shifts to the State to give gender-neutral explanations for dismissing the potential jurors." Blackwell, 171 Ill. 2d at 348, 665 N.E.2d at 786. "The State's explanation need not rise to the level justifying a challenge for cause, but must be based on a juror characteristic other than gender and cannot be pretextual." People v. Hudson, 195 Ill. 2d 117, 127-28, 745 N.E.2d 1246, 1253 (2001). The trial court decides whether the defendant carried his burden and proved

purposeful discrimination, and its findings of fact will not be reversed unless clearly erroneous. Blackwell, 171 Ill. 2d at 348-49, 665 N.E.2d at 786-87.

Here, the trial court's decision is not clearly erroneous. Defendant correctly points out that the State exercised four peremptory challenges directed only at male members of the jury venire; however, in response to defendant's allegations of intentional gender discrimination, the State offered explanations for each of its challenges that were based on juror characteristics unrelated to gender. Specifically, the State maintained it challenged potential jurors Norman Thompson, Tony Wardlow, Robert Rakers, and James Hays because (1) it had recently prosecuted Thompson's nephew for murder and the nephew was convicted of manslaughter, (2) Wardlow twice indicated that his understanding of the State's burden of proof was proof of guilt "without any doubt," (3) Rakers was the jury foreman on the previous day's jury that had returned a not-guilty verdict, and (4) Hays was also on the previous day's jury and was "good old buddies" with another man who ended up on defendant's jury.

Further, contrary to defendant's assertions, the State's proffered explanations were not a pretext for discrimination. Defendant argues the State's contention that it did not want jurors from the previous day's jury was merely a pretext for discrimination because it only challenged men for that reason and not women. First, defendant has misconstrued the State's argument. The State never maintained that it did not want any jurors

who had served the previous day but that it did not want two specific jurors who had served the previous day and who possessed other gender-neutral characteristics the State found undesirable. Specifically, Rakers had been the jury foreman the previous day and the State was concerned he could take a leadership role in defendant's jury and Hays was good friends with another male juror who was selected for defendant's jury. The State was concerned Hays and his friend would follow one another and decided to challenge Hays because he was on the previous day's jury and defendant's jury already contained jurors who had also served the previous day.

Defendant notes that the State did not challenge any female members of the jury venire who had served on the previous day's jury. While this is true, there were also several male members of the jury venire who had been on the previous day's jury and who the State also did not challenge. Defendant's jury, including the two alternate jurors, was composed of eight men and six women. Of those selected jurors, four men and four women had been on the previous day's jury. The State did not challenge any potential juror solely based on his jury service the previous day. Instead, as stated, the two jurors who were challenged for that reason, Rakers and Hays, were also found undesirable by the State for other gender-neutral reasons. Thus, the State's rationale for its challenges to Rakers and Hays was not a pretext for discrimination.

Finally, defendant contends the trial court erred

because it offered gender-neutral explanations for the State.  To support his assertion, defendant cited to the court's acknowledgment of that error during a hearing on defendant's posttrial motion.  The State maintains the court mistakenly acknowledged the error because it never improperly supplied the State with any gender-neutral explanation.  The portion of the record detailing defendant's objection to the State's peremptory challenges, and the proceedings that followed, supports the State's version of events, i.e., that it supplied its own gender-neutral rationale for each peremptory challenge.  The record does not indicate the State was prompted by the court, and defendant failed to cite any part of the record evidencing the court's alleged error.  Although he did support his argument with the court's acknowledgment of the error, that acknowledgment was made months after the error allegedly occurred and is, itself, not supported by the record.

Here the State provided gender-neutral explanations for each of its peremptory challenges and the record refutes defendant's contention that the State's explanations were merely a pretext for discrimination.  Additionally, the record also refutes defendant's contention that the trial court improperly supplied the State with gender-neutral explanations for its peremptory challenges.  For those reasons, the court's determination that the State did not engage in gender discrimination during jury selection was not clearly erroneous.

Defendant next argues he was denied a fair trial

because the jury heard K.S. "wailing" outside the courtroom following her trial testimony. He maintains he was prejudiced by that event and a new trial is warranted.

"A genuine emotional outburst by a witness giving vent to natural feeling is not always grounds for granting a mistrial." People v. Bradley, 43 Ill. App. 3d 463, 468, 357 N.E.2d 696, 700 (1976). Whether to grant a mistrial is within the trial court's discretion. Bradley, 43 Ill. App. 3d at 468, 357 N.E.2d at 700.

In this case, on the second day of trial, defendant requested the trial court make a record that, after testifying the day before, K.S. left the courtroom and "started wailing *** within earshot of the court, counsel[,] and all of the jurors." He also moved for a mistrial. After considering the parties' arguments, the court stated as follows:

> "[K.S.] did walk out of the courtroom
> under her own power. I heard her, as she
> left the courtroom, start to cry. I did not
> see her go down, and I had a better view than
> anybody, so I am comfortable that no jurors
> actually saw her collapse. In fact, I did
> [not] know she collapsed until this morning
> in talking to *** the bailiff in these pro-
> ceedings. I did hear her crying, being emo-
> tionally upset outside of the courtroom, and
> I did ask [the bailiff] to go make sure that

she got away from the courtroom. ***

I did not find it to be disruptive. In fact, we would have proceeded and in fact did proceed with the proceedings while she was having her emotional situation. I don't believe that it affected the jury at all, and I am denying the [motion for] mistrial."

In this instance, the trial court did not err when it denied defendant's request for a mistrial. K.S. testified without incident. The court was in the best position to determine the effect of K.S.'s emotional outburst on the jury. After listening to K.S.'s cries and having the opportunity to observe any reaction by the jury, the court concluded the event was not disruptive and had no effect. The record does not reflect that the court abused its discretion in reaching these conclusions.

Defendant further argues the trial court erred when it granted the State's motion in limine to prevent Dr. Froman from testifying that defendant was not a pedophile and there was a significant probability that K.S.'s allegations were the result of a vivid dream. He contends Dr. Froman's testimony would have negatively affected K.S.'s credibility and, by excluding Dr. Froman's testimony, the court denied him the right to present a defense.

A trial court's decision to grant or deny a motion in limine allowing or excluding certain evidence will not be overturned on review absent an abuse of discretion. People v. Owen,

˅ 10 ˅

299 Ill. App. 3d 818, 823, 701 N.E.2d 1174, 1178 (1998).  Further, expert testimony should be permitted only if:

> "(1) the proffered expert has knowledge and qualifications uncommon to laypersons that distinguish him as an expert; (2) the expert's testimony would help the jury understand an aspect of the evidence that it otherwise might not understand, without invading the province of the jury to determine credibility and assess the facts of the case; and (3) the expert's testimony would reflect generally accepted scientific or technical principles."  People v. Simpkins, 297 Ill. App. 3d 668, 681, 697 N.E.2d 302, 310 (1998).

Generally, a defendant may introduce evidence of his or her good character or personality through "general reputation" evidence but not expert personal opinion testimony.  In re B.J., 316 Ill. App. 3d 193, 201, 735 N.E.2d 1058, 1065 (2000).  Additionally, attempts to use purported expert testimony to bolster or attack the credibility of witnesses should be rejected.  B.J., 316 Ill. App. 3d at 201, 735 N.E.2d at 1065.

At a hearing on the State's motion, Dr. Froman testified and the parties stipulated that he was a clinical psychology expert.  Dr. Froman stated he conducted a limited, one-hour interview with defendant and took legal, personal, and social histories.  He also took a sexual history that was not as inclu-

sive as the complete sexual history usually taken during sexual-offender evaluations.  During the interview, Dr. Froman saw nothing to indicate defendant was a pedophile or had any deviance that would lead him to molest a 14-year-old girl.  Dr. Froman also testified that if defendant's accuser was asleep prior to making the accusations and watched a sexually provocative movie before going to bed, there was "some reasonable possibility" that she dreamed the abuse.  Additionally, he testified that if the accusations arose at four in the morning, it would suggest the accuser was asleep.  Further, she could possibly have been in rapid eye movement (REM) sleep, during which a vivid dream is more likely to occur.

On cross-examination, Dr. Froman acknowledged he did not know whether defendant's accuser was asleep and it was only his opinion that one explanation for the allegations against defendant could be that the accuser experienced a vivid dream. However, if he interviewed the accuser and she stated she never went to sleep, it would not be his opinion that she dreamed the event.  Additionally, Dr. Froman reiterated that he saw nothing during the interview with defendant that would allow him to make a diagnosis of pedophilia but acknowledged that not all individuals who commit a sex offense are pedophiles.  Finally, Dr. Froman admitted the only information he possessed was what defendant had provided.  On redirect examination, Dr. Froman testified that people are generally asleep at four in the morning, the incident in question allegedly occurred at that time, and a pedophile is

more likely to sexually molest a young child than someone who is not a pedophile.

The trial court concluded Dr. Froman's testimony would be highly speculative and was not based on the facts of the case regarding whether K.S. was asleep immediately prior to the alleged incident. It determined that Dr. Froman would, in essence, be testifying as to whether defendant was being truth-ful, which the court did not believe was appropriate. Finally, the court stated it did not believe Dr. Froman's testimony would be of any value or benefit to the jury and granted the State's motion in limine.

The court's decision to exclude Dr. Froman's testimony was not an abuse of its discretion. First, as stated, opinion testimony is not a proper way to admit evidence of a defendant's good character. B.J., 316 Ill. App. 3d at 201, 735 N.E.2d at 1065. In B.J., 316 Ill. App. 3d at 200-01, 735 N.E.2d at 1065-66, this court applied that rule to uphold the trial court's exclusion of expert testimony that the defendant, who was accused of inappropriately touching his young child, did not fit the profile of a sex offender. Similarly, in this case, defendant sought to introduce evidence from Dr. Froman indicating defendant was not a pedophile. For the same reasons as expressed in B.J., the trial court did not abuse its discretion by excluding Dr. Froman's testimony.

Second, Dr. Froman's testimony that K.S.'s allegations could have been the result of a vivid dream are not based on the

facts of this case. Dr. Froman never interviewed K.S. and did not know whether she had been asleep prior to making her allegations. Further, there was no evidence presented at defendant's trial that K.S. was asleep at any point on the night in question. Thus, Dr. Froman's proffered testimony was highly speculative, would not have provided the jury with any useful information, and would have invaded the province of the jury to determine the credibility of witnesses and assess the facts of the case. For those reasons, the trial court did not abuse its discretion in excluding this testimony.

Finally, defendant contends he should have been granted a new trial based on the newly discovered evidence that K.S. stated she set defendant up and "he was in jail for something he did not do." Specifically, he alleges the evidence meets all the necessary requirements for the grant of a new trial and, because the State's only evidence consisted of statements made by K.S., newly discovered evidence that her story changed "would conclusively defeat the [S]tate's case."

Newly discovered evidence warrants a new trial when it is (1) of such conclusive character that it will probably change the result on retrial, (2) material to the issue and not merely cumulative, (3) discovered after trial, and (4) of such character that the defendant in the exercise of due diligence could not have discovered it earlier. People v. Orange, 195 Ill. 2d 437, 450-51, 749 N.E.2d 932, 940 (2001). "[T]he recantation of testimony is regarded as inherently unreliable, and a court will

not grant a new trial on that basis except in extraordinary circumstances." People v. Steidl, 177 Ill. 2d 239, 260, 685 N.E.2d 1335, 1345 (1997). A court's decision to grant or deny a motion for a new trial based on newly discovered evidence will not be overturned by a reviewing court absent an abuse of discretion. People v. Beard, 356 Ill. App. 3d 236, 242-43, 825 N.E.2d 353, 360 (2005).

At defendant's trial, K.S. testified, on April 16, 2004, she intended to spend the night at her friend A.J.'s house. At that time, A.J.'s mother was defendant's girlfriend and defendant also lived in the home. After watching movies, K.S. attempted to fall asleep on a futon bed next to A.J. but could not sleep. At some point, defendant entered the futon and laid between K.S. and A.J., whom K.S. believed was asleep. K.S. testified defendant said, "I know what you and [A.J.] were doing and if you want me to keep your secret, then you best let me have a turn, too." While defendant was speaking, he had his hand on K.S.'s right thigh and was rubbing it back and forth. K.S. stated defendant also put his hand between her legs and moved it up toward her vagina.

After K.S. told defendant she did not know what he was talking about, and twice scooted away from him, defendant left the futon and sat in a nearby chair. K.S. testified she got up, sat on the edge of the futon, and felt like she was going to be sick. After a few minutes, she went to the bathroom and then to A.J.'s room to collect her belongings. A short time later, A.J.

came to her and asked what was wrong.  K.S. told A.J. she did not want to stay and asked A.J. to help her leave.  K.S. testified the front door to the house made too much noise when it was opened and she did not want defendant to hear and prevent her from leaving.  A.J. suggested K.S. climb out of a window on the back porch.  After climbing out of the window, K.S. asked A.J. to leave with her but A.J. refused.  K.S. then went to the home of a friend who lived six or seven blocks away and reported the incident to her friend's mother.

At the hearing on defendant's motion for a new trial based on newly discovered evidence, C.P. testified she attended the same school as K.S.  In January 2005, C.P. was at her locker and overheard K.S., who was standing around the corner from C.P.'s locker, state that K.S. got defendant "put away" to get revenge on A.J.  C.P. also heard K.S. say that defendant did not "do any of it and that it was just all to get payback on [A.J.]."  C.P. could not see K.S. when the statements were made but did see her shortly thereafter.  C.P. did not know the people K.S. was speaking to and could not describe them except to say they were tall and there were two boys and two girls.  Additionally, C.P. testified she was friends with A.J. but not K.S. because, although C.P. wanted to be K.S.'s friend, K.S. did not give C.P. a chance to become one.  At a second hearing on defendant's motion, K.S. testified she never made the statements alleged by C.P.

The trial court stated it carefully considered the

matter and, initially, it noted defendant's motion stated he had located a witness who spoke directly to K.S.; however, at a hearing on the motion, C.P. testified she only overheard statements K.S. made to others. Further, C.P. could not identify who K.S. was speaking to when the statements were made. The court also noted C.P. was friends with A.J. but not K.S. Finally, it pointed out that C.P. testified K.S. admitted lying about defendant to get revenge on A.J. The court found this testimony remarkable because evidence at defendant's trial established that K.S. and A.J. were friends at the time of the offense. In fact, on the night of the offense, K.S. was staying at A.J.'s house, K.S. sought A.J.'s help in leaving the home after defendant's advances, A.J. helped K.S. leave, and K.S. asked A.J. to leave with her. The court concluded K.S. had no reason to seek revenge on A.J. It then found C.P. was not credible and denied defendant's request for a new trial.

In this case, the trial court did not abuse its discretion by denying defendant's motion for a new trial. Specifically, the newly discovered evidence was not of such conclusive character that it would have changed the result on retrial. C.P.'s testimony concerned an alleged recantation by K.S., which K.S. denied making. After carefully considering the evidence, including C.P.'s testimony, the court stated it did not believe C.P. and determined that a jury could find her not credible. As detailed above, the record supports the court's findings.

The trial court had the opportunity to observe C.P. and

hear her testimony.  It determined she was not credible and stated it did not believe her.  The record supports the court's findings and its denial of defendant's motion for a new trial was not an abuse of its discretion.

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, J., concurs.

COOK, J., specially concurs.

JUSTICE COOK, specially concurring:

I dissented in <u>Beard</u> because the trial court refused to consider evidence of the witness's recantation, on the basis that it was hearsay, and the witness was not called at the posttrial hearing.  <u>Beard</u>, 356 Ill. App. 3d at 246-47, 825 N.E.2d at 362-63 (Cook, P.J., dissenting).  In the present case, in contrast, the trial court properly considered C.P.'s testimony of what she supposedly heard K.S. say, and K.S. took the stand and denied making the statements alleged by C.P.