NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210048-U

NO. 4-21-0048

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 17, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Ant.C., A'ny.C., A'man.C., and A'mar.C., Minors | ) ) | Appeal from Circuit Court of |
| | ) | Champaign County |
| (The People of the State of Illinois, | ) | No. 20JA86 |
| Petitioner-Appellee, | ) | |
| v. | ) | Honorable |
| Pashion W., | ) | John R. Kennedy, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's adjudicatory order
finding the minors neglected and dispositional order finding parental unfitness
were not against the manifest weight of the evidence.

¶ 2    In September 2020, the State filed a petition for adjudication of neglect, alleging

Ant.C. (born March 6, 2014), A'ny.C. (born April 19, 2015), A'man.C. (born June 9, 2016), and

A'mar.C. (born September 28, 2017) were neglected pursuant to section 2-3(1)(b) of the Juvenile

Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)), in that their

environment was injurious to their welfare when they resided with respondent, Pashion W.,

because the environment exposed the minors to domestic violence.  Respondent father, Anthony

C., legal father to Ant.C., A'ny.C., A'man.C., and putative father to A'mar.C. is not a party to

this appeal.

¶ 3          In December 2020, the trial court entered an adjudicatory order finding the minors neglected. Following a January 2021 dispositional hearing, the trial court (1) made the minors wards of the court, (2) found respondent unfit, and (3) placed custody and guardianship of the minors with the Illinois Department of Children and Family Services (DCFS).

¶ 4          Respondent appeals, arguing the trial court's adjudicatory and dispositional orders were against the manifest weight of the evidence. We affirm.

¶ 5                                        I. BACKGROUND

¶ 6          In September 2020, the State filed a petition for adjudication of neglect, alleging Ant.C., A'ny.C., A'man.C., and A'mar.C. were neglected in that their environment was injurious to their welfare when they resided with respondent due to exposure to domestic violence. See 705 ILCS 405/2-3(1)(b) (West 2018).

¶ 7                                 A. Adjudicatory Hearing

¶ 8          On December 11, 2020, an adjudicatory hearing commenced. We summarize the evidence necessary to resolve this appeal.

¶ 9                                 1. *Officer Alejandro Carbajal*

¶ 10         Alejandro Carbajal, a Rantoul, Illinois, police officer, testified that on April 9, 2020, he responded to a physical domestic dispute at respondent's residence. Once at the residence, Officer Carbajal made contact with respondent and her four children. Officer Carbajal observed a scratch on respondent's right cheek and swelling on her forehead. Officer Carbajal testified one of the children told him "something to the effect of hit Mommy." Respondent told Officer Carbajal she got into an argument with her girlfriend, Tonisha Rice. Respondent and Tonisha lived together at the residence. Officer Carbajal testified respondent told him Tonisha and respondent argued in the bedroom of the residence and Tonisha hit respondent in the face

during the argument. Respondent told Officer Carbajal the children ran into the bedroom when the argument started. After speaking with respondent, Officer Carbajal arrested Tonisha.

¶ 11                              2. *Officer Rikki McComas*

¶ 12        Rikki McComas, a Rantoul police officer, testified that on August 10, 2020, she was dispatched to respondent's residence. When Officer McComas arrived at the residence, respondent and her four children were present. Respondent told Officer McComas she had been arguing with her ex-girlfriend, Tonisha, all day. Respondent described Tonisha as a live-in roommate.

¶ 13        Officer McComas testified respondent told her "the police had been over multiple times for domestic issues" that day. Further, respondent told Officer McComas that around 11 p.m., Tonisha returned to the residence with her sister, Tabreecia Rice. Tonisha knocked on the front door, then Tabreecia kicked the front door open. After breaking the door open, Tabreecia grabbed a bottle of tequila out of Tonisha's hand, rushed into the residence, and attacked respondent. Officer McComas testified respondent described the attack as follows:

> "Tabreecia had grabbed the bottle of Patrón from Tonisha.
> [Respondent] stated as she backed into the kitchen, she—Tabreecia
> struck her on the—in the head with the bottle of Patrón.
> [Tabreecia] then began pulling her hair. [Tabreecia] grabbed a
> frying pan off of the stove and attempted to hit her with it but
> missed."

Tonisha and Tabreecia left the residence when they realized respondent had called the police. Officer McComas testified she observed a "small cut with a bump on [respondent's] right temple

that was bleeding." Officer McComas also observed the broken front door and stated the kitchen looked "disheveled." After speaking with respondent, Officer McComas arrested Tabreecia.

¶ 14                                    3. *Heather Forrest*

¶ 15          Heather Forrest, an investigator for DCFS, testified that on April 14, 2020, she interviewed respondent about the April 9, 2020, domestic violence incident. During the interview, respondent confirmed to Forrest that an incident between herself and Tonisha occurred on April 9. Specifically, respondent told Forrest that "[Tonisha] was angry because people had been saying that [respondent] was talking to someone else, and [Tonisha] was intoxicated and was angry and put her hands on [respondent]." Respondent told Forrest that she and Tonisha moved in together in January 2020 and were in a dating relationship but respondent was ending the relationship. Forrest testified that at the time of the April 2020 domestic violence incident, the children lived at the residence with respondent and Tonisha. Forrest stated respondent told her that respondent father "really wasn't involved with the children, he lived up in the Chicago area. And that she had left that relationship because of domestic violence."

¶ 16                                    4. *Shantel Pettigrew*

¶ 17          Shantel Pettigrew, an investigator for DCFS, testified that in August 2020, she interviewed respondent about the August 10, 2020, domestic violence incident. Pettigrew confirmed the August 10, 2020, domestic violence incident occurred when Tonisha and Tabreecia showed up to the residence and "a physical altercation ensued in which [respondent] was hit with the frying pan and a bottle of Patrón there while the children were in the home."

¶ 18                                    5. *Respondent*

¶ 19          Respondent testified she and the children currently resided with a friend in Danville, Illinois, while looking for a permanent residence. Respondent confirmed the domestic

violence incidents in April and August 2020 occurred consistent with the police officers' testimony. Respondent testified that prior to the April 2020 incident, she and Tonisha were in a romantic relationship. After the incident, respondent ended the relationship, but Tonisha continued to live in the residence in Rantoul with respondent because she helped with the children. After the August 2020 incident, respondent and the children moved out of the residence, and respondent no longer had a relationship with Tonisha. Respondent also confirmed that she called the police after both domestic violence incidents.

¶ 20 On cross-examination, respondent testified that since the August 2020 incident, she and the children lived "back and forth at my mom['s] house or my sister's house. And, at one point, I stayed at a hotel for a week straight." When asked if the school-aged children were registered for school, respondent stated, "They were registered for school in Rantoul before the situation happened, but I haven't got them back in school, 'cause I didn't know if I was gonna live in Champaign or Danville as I was looking for a house." Respondent testified Ant.C. and A'ny.C. had been registered for school "but they never went 'cause it was in Rantoul." Respondent had not registered the children in school in Danville because she just moved there the day before the hearing.

¶ 21                6. *Trial Court's Finding*

¶ 22 At the close of evidence, the trial court concluded the State proved the allegations of neglect in the petition by a preponderance of the evidence. Specifically, the court found the two domestic violence incidents and Tonisha's continued residence in the home with respondent and the children exposed the children to domestic violence. Further, the court noted respondent's relationship with respondent father ended because of domestic violence.

¶ 23    On December 11, 2020, the court entered a written adjudicatory order finding Ant.C., A'ny.C., A'man.C., and A'mar.C. neglected. Specifically, the court stated as follows:

"The respondent mother has had repeated instances of domestic violence with a partner, Tonisha Rice who later became a roommate. On or about April 9, 2020[, respondent] and Tonisha argued. They were in a dating relationship and living together. The children were present. [Respondent] was battered by Tonisha. [Respondent] had visible injuries.

On or about August 10, [2020,] a more violent episode of domestic violence occurred involving Tonisha and her sister[,] who attacked the respondent mother at her home. Tonisha was still residing at the residence of respondent mother.

Respondent mother advised Heather Forrest that her prior relationship with [respondent father] had been violent. She advised that [respondent father] had little involvement with the children.

Respondent mother testified that Tonisha provided some things for the children that she could not provide. Respondent mother left the home after August 10th ***[.] She then moved in with her mother."

¶ 24                    B. Dispositional Reports

¶ 25    On January 6, 2021, the Children's Home & Aid (CHA) filed a report "comprised of attempted dates of contact with [respondent,] *** wellness checks, contact with [respondent's]

- 6 -

family members, last date of in-person contact with [respondent's] family, and previously [*sic*] incidents of non-compliance are also listed." The report covered the period from September 8, 2020, to January 2, 2021. The report stated that respondent's "compliance began to be an issue" in September 2020 when respondent failed to answer the door at her residence for her caseworker or return the caseworker's telephone calls for a scheduled visit. In October 2020, respondent failed to attend a scheduled Zoom meeting, return text messages, telephone calls, or emails. Caseworkers rescheduled the Zoom meeting, and respondent also failed to attend the rescheduled meeting. Subsequently, the caseworker warned respondent that noncompliance "will result in involving the state's attorney and closing out [i]ntact unsuccessfully." The caseworker went over what was expected of respondent, but in November 2020, respondent again failed to answer the door at her mother's house for a scheduled visit. The caseworker could not reach respondent by telephone or text message and contacted the state's attorney's office to report respondent's lack of compliance.

¶ 26        Also in November 2020, respondent told her caseworker that her mother kicked her and her children out of the house and they stayed for a night at a hotel in Urbana, Illinois. On November 9, 2020, the caseworker attempted to complete a home visit at respondent's sister's house, but when the caseworker arrived, respondent's sister informed the caseworker that respondent and the children were not living with her. Respondent's sister told the caseworker that respondent was "too worried about partying" and "being with different guys" and that her children were not her "first priority." After calling respondent to inform her she missed another scheduled meeting, respondent told the caseworker "[w]e could end the assignment right now" and hung up the telephone abruptly. The caseworker attempted to call respondent back multiple times and eventually called the Champaign police to complete a wellness check.

¶ 27    From November 10, 2020, through December 10, 2020, the caseworker attempted to call or text respondent twice a day every day to no avail. The caseworker called the Family Advocacy Center to see if respondent was in contact with them, but the caseworker was informed that respondent never completed the intake appointment and never followed up with the center. On November 30, the caseworker reached respondent's sister who informed the caseworker that respondent and the children were not staying at her house. In the beginning of December, the caseworker called the school-age children's school and discovered respondent never enrolled the children in school. Respondent had informed her advocate the children were enrolled in school.

¶ 28    On December 10, 2020, respondent called the caseworker and maintained that she and the children lived at her sister's house. When the caseworker informed respondent that her sister denied she lived with her, respondent stated "she was staying at her sister's sometimes, a motel others, and in Chicago sometimes." Respondent told the caseworker she did not mean to call her "because she thought she was clear about not wanting to participate in Intact."

¶ 29    On December 21, 2020, respondent called the caseworker and informed her she moved into a house in Danville. The caseworker visited the residence, where respondent informed the caseworker that she enrolled Ant.C. and A'ny.C. in school. However, respondent told the caseworker "she forgot the name" of the school.

¶ 30    The end of the report stated as follows:

"At this time, due to the length of time [respondent] has been
opened in intact services (9/8/20-Present) it is in the caseworker's
and intact supervisor's opinion that client hasn't made progress in
her following service plans goals: Enrolling and attending

- 8 -

Domestic Violence classes as well as enrolling in and attending anger management classes. Since 12/11/2020 (ADJ2 Hearing), [respondent] has been made aware of the urgency to re-engage her in services, enroll the kids officially in school, get a job, and enroll in classes on multiple occasions. Therefore, [respondent] has failed to make progress in her service plan, besides obtaining a home for the children to live in. [Respondent] has also stated on two occasions that she doesn't want intact services (on 11/9 and 12/10) and this agency has made reasonable effort to engage her throughout case duration."

¶ 31 On January 8, 2021, DCFS filed an integrated assessment dated October 21, 2020. The integrated assessment recounted the August 10, 2020, incident that brought the case to the attention of DCFS. The report also disclosed respondent did not have a criminal record, she denied substance abuse or mental health issues, her minimal work history where she currently was without a job, and then-housing circumstances. The report also addressed respondent's relationship with Tonisha. Respondent denied she and Tonisha were in a romantic relationship. The report indicated respondent had "a good relationship with her children" but "[respondent] understands that she has areas to improve on in order to effectively tend to her children's needs and ensure their safety and well[-]being. [Respondent] needs to secure an apartment and a job."

¶ 32 The report also disclosed information about the four children.

¶ 33 C. Dispositional Hearing

¶ 34    On January 8, 2021, the trial court conducted a dispositional hearing. The court acknowledged it would "consider reports placed on file, including today." Then, respondent was called to testify.

¶ 35                                    1. *Respondent*

¶ 36    Respondent testified she and her four children lived in a "three-bedroom home in Danville, Illinois." Respondent and the children moved into the residence on December 18, 2020. Respondent also testified she enrolled Ant.C. and A'ny.C. at Meade Park Elementary School. Ant.C. was in first grade, and A'ny.C. was in kindergarten. Respondent contacted Early Head Start about the other two children, and she was awaiting an email with instructions on how to procced. Respondent testified she was not employed but was seeking employment.

¶ 37    On cross-examination, respondent testified friends paid for her house. When asked if the children visited their father in Chicago, respondent stated, "Probably like two or three times a year." Respondent testified the two older children started school two days before the hearing.

¶ 38                              2. *The Trial Court's Finding*

¶ 39    After taking into consideration the adjudicatory order, the dispositional reports on file, the testimony given at the hearing, and the recommendations of the parties, the court found it was in best interest of the minors and the public that the minors be adjudicated neglected and named wards of the court. The court also found respondent "unfit, for reasons other than financial circumstances alone, to care for, protect, train, and discipline the minors." The court determined "[i]t would be contrary to the minor's health, safety, and best interests to be in [respondent's] custody." Specifically, the court reasoned as follows:

"Here's the situation that's happened. What the court identified in the adjudicatory order was a significant episode, repeat episodes of domestic violence. There's not any indication that that situation prior to now, at disposition, has been resolved in any way through services attended to by respondent mother. Also there has been a repeated instability of her residence. That does matter to the children. It matters a lot to their stability, and it matters a lot to the older children's ability to be involved in education. And in essence what respondent mother's done since the time of the adjudication is pretty much defeat the opportunity of the caseworkers to have a grasp on what—where she is, and what is going on with the children. It's not a situation that the court can allow."

¶ 40       On January 11, 2021, the court entered a written dispositional order to that effect. Specifically, the court (1) made the minors wards of the court, (2) found respondent unfit, and (3) placed custody and guardianship of the minors with DCFS.

¶ 41       This appeal followed.

¶ 42                                      II. ANALYSIS

¶ 43       On appeal, respondent asserts the trial court's adjudicatory and dispositional findings were against the manifest weight of the evidence. We address these arguments in turn.

¶ 44                              A. Adjudicatory Finding

¶ 45       The Juvenile Court Act provides a two-step process the trial court must follow in deciding whether minor children should become wards of the court. *In re A.P.*, 2012 IL 113875,

¶ 17, 981 N.E.2d 336; see also 705 ILCS 405/2-18(1), 2-22(1) (West 2018). Step one of the process is the adjudicatory hearing where the trial court considers only whether the children are abused, neglected, or dependent. See *id.* § 2-18(1). The State bears the burden of proving a neglect allegation by a preponderance of the evidence. *A.P.*, 2012 IL 113875, ¶ 17. An appellate court will not reverse a trial court's neglect finding unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 46        Here, the State presented evidence at the adjudicatory hearing of the two domestic violence incidents involving respondent while the children were present. On April 9, 2020, a domestic violence incident between Tonisha and respondent resulted in respondent calling the police. When the police arrived, an officer observed a scratch on respondent's right cheek and swelling on her forehead. Further, the children were present during the altercation. Officer Carbajal testified one of the children told him "something to the effect of hit Mommy." Subsequently, Officer Carbajal arrested Tonisha. Respondent testified that after the incident she broke up with Tonisha but Tonisha continued to reside in the home with her and the children. Tonisha helped care for the children.

¶ 47        On August 10, 2020, another domestic violence incident occurred between respondent and Tonisha's sister, Tabreecia. Respondent called the police about the incident. When Officer McComas arrived, the children were present, and respondent told her "the police had been over multiple times for domestic issues" that day. Around 11 p.m., Tonisha and Tabreecia returned to the residence where Tabreecia broke the front door, rushed into the residence, and attacked respondent with a tequila bottle. Officer McComas testified she

observed a "small cut with a bump on [respondent's] right temple that was bleeding." Subsequently, Officer McComas arrested Tabreecia.

¶ 48   Further, respondent confirmed the domestic violence incidents in April and August 2020 occurred consistent with the police officers' testimony. Respondent testified that since the August 2020 incident, she and the children lived "back and forth at my mom['s] house or my sister's house. And, at one point, I stayed at a hotel for a week straight." Respondent also acknowledged the two older children were not registered for school nor did the children attend school.

¶ 49   The trial court adjudicated the minors neglected where the court found two domestic violence incidents and Tonisha's continued residence in the home with respondent and the children exposed the children to domestic violence. Further, respondent's relationship with respondent father ended because of domestic violence.

¶ 50   Respondent argues because she (1) was not the aggressor in either domestic violence incident, (2) removed herself and the children from the home after the August 2020 incident, and (3) ended her relationship with respondent father because of domestic violence, her actions "were responsible and in the best interests of the children[.]" Therefore, respondent asserts she eliminated the children's exposure to domestic violence.

¶ 51   "Parents have a duty to protect their children from harm, and their failure to provide a safe and nurturing shelter clearly falls within the concept of statutory neglect." *In re B.J.*, 316 Ill. App. 3d 193, 199-200, 735 N.E.2d 1058, 1064 (2000). Witnessing or hearing domestic violence does not provide a minor with a safe, nurturing environment. Respondent allowed her children to be exposed to domestic violence on more than one occasion, and she failed to immediately remove the children after the first incident.

¶ 52        After reviewing the record, we find the evidence supports the trial court's finding of neglect.  Respondent does not dispute that either domestic violence incident occurred in the residence while the children were present.  Further, after the April 9 incident, respondent acknowledged she did not remove the children from the home because Tonisha helped her with the children.  While respondent eventually moved after the August 10 incident, respondent admitted she and the children did not have stable housing.  Specifically, they were "back and forth" from different residences, and the children were not in school.

¶ 53        We give deference to the trial court's findings of fact at an adjudicatory hearing because the court "is in the best position to observe the conduct and demeanor of the parties and the witness and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99, 777 N.E.2d 930, 943 (2002).  In this instance, evidence existed to support the court's finding the minors had been exposed to domestic violence in the home.  We therefore conclude the trial court's adjudicatory finding was not against the manifest weight of the evidence.

¶ 54                          B.  Dispositional Finding

¶ 55        Respondent next asserts the trial court's dispositional finding of parental unfitness was against the manifest weight of the evidence.

¶ 56        Following an adjudication of neglect, the trial court must conduct a dispositional hearing to determine if the minor should be made a ward of the court.  705 ILCS 405/2-22 (West 2018).  In considering the appropriateness of wardship, the court must decide if the parent is unfit, unable, or unwilling, for reasons other than financial reasons alone, to care for, protect, train, or discipline the child, and that the health, safety, and best interest of the child will be jeopardized if the child remains in the parent's custody.  705 ILCS 405/2-27(1) (West 2018).

We will not overturn the court's dispositional order unless it is against the manifest weight of the evidence. *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 44, 22 N.E.3d 329.

¶ 57 After reviewing the record, we find the trial court's dispositional finding of parental unfitness was not against the manifest weight of the evidence. Here, the dispositional report filed on January 6, 2021, outlined respondent's significant history of noncompliance. In the report, the CHA caseworker stated respondent's "compliance began to be an issue" in September 2020. Respondent failed to attend scheduled visits from the caseworker, attend scheduled and rescheduled Zoom meetings, and answer or return the caseworker's telephone calls and text messages on multiple occasions. In November 2020, the caseworker contacted the state's attorney's office to report respondent's lack of compliance. On two occasions, respondent stated she did not want intact services.

¶ 58 Respondent also lied to her caseworker about living with her sister. The caseworker contacted respondent's sister and found respondent and the children did not reside with her. Further, the sister told the caseworker respondent was "too worried about partying" and "being with different guys" and that her children were not her "first priority."

¶ 59 From November 10, 2020, through December 10, 2020, the caseworker attempted to call or text respondent twice a day every day to no avail. At this time, the caseworker discovered respondent never completed her intake appointment at the Family Advocacy Center and respondent never enrolled the school-aged children in school. When the caseworker finally reached respondent, she continued to lie about where she and the children lived.

¶ 60 In mid-December, respondent informed the caseworker she obtained housing in Danville and she enrolled Ant.C. and A'ny.C. in school. However, respondent told the caseworker "she forgot the name" of the school. Ultimately, the caseworker opined respondent

failed to make progress in her service plan where she failed to (1) enroll and attend domestic violence classes, (2) enroll and attend anger management classes, (3) enroll the children in school, and (4) obtain employment. While the caseworker acknowledged respondent recently obtained a home for the children, respondent failed to make a reasonable effort to engage throughout the case duration.

¶ 61 At the dispositional hearing, respondent testified she and the children recently moved into a three-bedroom home in Danville. Further, respondent enrolled the two older children at Meade Park Elementary School and contacted Early Head Start about schooling for the two younger children. However, respondent testified she still had not obtained employment, and when asked how she paid for the house, she testified her friends paid for it.

¶ 62 Ultimately, the trial court found respondent unfit. Specifically, the court concluded respondent failed to engage in services related to the domestic violence incidents or provide stability for the children.

¶ 63 We agree with the trial court that stability is important in this case. Respondent's failure to provide stability for the children is evident where respondent moved the children around to multiple places to live and failed to enroll the older children in school. While respondent at the time of the dispositional hearing had recently obtained housing and enrolled the children in school, she had yet to engage in services for domestic violence, anger management, or find stable employment.

¶ 64 Accordingly, we conclude the trial court's dispositional order was not against the manifest weight of the evidence.

¶ 65 III. CONCLUSION

¶ 66 For the foregoing reasons, we affirm the trial court's judgment.

¶ 67        Affirmed.