NO. 4-97-0632

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT 

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellee, ) Circuit Court of

v. ) McLean County

JOHN ALLAN SIMPKINS, ) No. 95CF963

Defendant-Appellant. ) 

) Honorable

) Ronald C. Dozier,

) Judge Presiding.

______________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In May 1997, a jury convicted defendant, John Allan Simpkins, of three counts of aggravated criminal sexual assault, finding that he committed acts of sexual penetration with his daughter, K.S., when she was under 13 years of age (720 ILCS 5/12-14(b)(1) (West 1992)).  In June 1997, the trial court entered a judg­ment of guilty as to two counts, but granted defendant's motion for judgment of acquittal notwithstanding the  verdict as to the remaining count (count III).  The court then sentenced defendant to eight years in prison on count I and seven years in prison on count II, with those sen­tences to be served consecu­tively. 

Defendant appeals, arguing that the trial court errone­ously (1) admitted certain hearsay testimony in violation of section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 1992)); (2) admitted certain hearsay testimony in violation of section 115-13 of the Code (725 ILCS 5/115-13) (West 1992); (3) permitted the jury to take into the jury room during deliberations an Illinois Department of Children and Family Services (DCFS) report which had not been admitted into evidence; (4) admitted certain opinion testimony; and (5) sen­tenced defendant to consecutive sentences.  Defendant also argues that the State failed to prove him guilty beyond a reasonable doubt.  We reverse and remand for a new trial.

I.  BACKGROUND

In November 1995, the State charged defendant by indictment with three counts of aggravated criminal sexual assault.  Counts I and II alleged that sometime between October 1, 1993, and November 30, 1993, defendant committed acts of sexual penetration with K.S. (five years old at the time of the offenses and eight years old at trial) using his finger (count I) and a bottle (count II).  Count III alleged that sometime between June 1, 1994, and July 30, 1994, defendant committed an act of sexual penetra­tion with K.S. using his finger.  720 ILCS 5/12-14(b)(1) (West 1992).

A.  The Section 115-10 Hearing

In April 1996, the State filed a notice of intent--under section 115-10 of the Code--to offer at defendant's trial state­ments K.S. made to Mel Devall, a DCFS child protective services investigator.  Later during that same month, the State filed another such notice of intent to offer statements K.S. made to her mother, Annette Simpkins.

In April 1997, the trial court conducted a section 115-10 hearing, and the following testimony was presented.  Devall testified that on September 16, 1994, he interviewed K.S. (then six years old) at her grade school pursuant to allegations of physical abuse of K.S. and her sib­lings by defendant and allega­tions of sexual abuse of an older sibling (D.D.) by defen­dant, which had been reported to DCFS.  During that inter­view, Devall ini­tially established that K.S. knew the difference between the truth and a lie, a good touch and a bad touch, and inside and outside.  Devall then asked K.S. if she remembered him.  (Devall had interviewed K.S. about one month earlier pursuant to a report of sexual abuse of D.D. by a grandfa­ther.)  K.S. responded that she remembered that he had previously talked with her "about grandpa touching [D.D.]."  Devall then testified that K.S. indicated that defen­dant had touched her, as follows:

"A.  [Devall:]  Then I asked her, has anyone ever touched you in a bad way?  She said yes, daddy had, that daddy had spanked her real hard and left bruises on her.

* * *

Q.  [Prosecutor:]  What did you ask her then?

A.  Has anyone else ever touched you in a bad way?

Q.  And what, if anything, did she ever say?

A.  Yes -- daddy.

* * *

Q.  What was the [next] question?

A.  How did daddy touch you in a bad way?

Q.  And what, if anything, did she say?

A.  She stated that daddy had taken her upstairs and put her on [a sibling's] bed, had pulled her pants and underwear down, had inserted his finger inside of her private, that daddy also had put a bottle inside of her private.  She stood up at that point and said daddy told me to lay on the bed like this, and she stood up and spread her legs apart.  She said that blood had come out of that, and that it hurt."

Devall also stated that K.S. told him that the sexual abuse had happened on more than one occasion, the first time was when she bled and the last time was on the Fourth of July.  

On cross-examination, Devall acknowledged that he did not specifical­ly recall what he had asked K.S. during his previ­ous interview of her (which took place about one month before the September 16, 1994, interview).  He stated, however, that typi­cally he would ask whether the child had been told anything about the alleged abuser.  Devall also stated that he did not ask K.S. when the first incident happened or which Fourth of July she was referring to.  He also stated that Annette told him that K.S. had recanted the allegations against defendant. 

Annette (K.S.' mother) testified that on one occasion after Devall's September 16, 1994, interview of K.S., K.S. came to her and asked why defendant "would do something like that."  K.S. said nothing else, and Annette did not question her about the statement.  On another occasion when Annette and K.S. were in a pharmacy, K.S. brought a bottle of Betadine to Annette and said "this is what daddy used."  Annette told her to put the bottle back and did not question K.S. about the statement.  Annette also testified about K.S.' recantation, as follows:

"[I]t was a few months ago, [K.S.] -- well, the girls went with their [paternal] grandparents for that Saturday, and a few days -- it was like two or three days later -- [K.S.] says how come we can't see dad, and I'm just like, we can't talk about that.  She said, well, I know why, and I lied about what daddy did, and I said, why would you lie about some­thing like that, and she said be­cause [K.S.] was mad at him.  And I said why were you mad at him, and she was, like be­cause he used to hit us all of the time."

The trial court determined that the statements K.S. made to Devall and Annette were admissible pursuant to section 115-10 of the Code. 

B.  Trial Testimony  

At defendant's trial, K.S. testified that defendant had spanked her with a belt but had not done anything else that hurt her.  She stated that she had told Devall "bad things" and what she told him was a "big lie."  She further stated that she did not know why she lied to Devall.  K.S. remembered seeing Dr. Lance Cordoni, a pediatrician at the Pediatric Resource Center (a child abuse center), but she did not remember talking to him.  

On cross-examination, K.S. testified that she did not remember Devall interviewing her the first time.  She stated that she had lied to her mother because K.S. was mad at defendant.  She also stated that defendant had not put his finger or a bottle inside her.

Annette testified that on one occasion when K.S. was in kindergarten, Annette noticed blood on K.S.' underwear.  That same day, she took K.S. to Dr. Jivan Patel, K.S.' pediatrician.  Patel visually examined K.S. and told Annette that K.S. was "fine."  Annette also stated that K.S. told her that she had lied about defendant sexually abusing her because she was mad at him.  She also testified substantially the same as she had at the section 115-10 hearing regarding the statements K.S. made to her after Devall's September 16, 1994, interview of K.S.

On cross-examination, Annette testified that when she noticed blood on K.S.' underwear, she asked K.S. what happened and K.S. responded that she did not know.  She also stated that when K.S. showed her the bottle of Betadine in the pharmacy, K.S. did not say what defendant had done with the bottle.  She further stated that she and defendant routinely kept Betadine in their home and used it on their children. 

Devall testified that he had been a DCFS child protec­tive services investigator for seven years, and he had to com­plete 20 hours of continuing education each year.  He stated that he had interviewed "over a thousand" children who had reported sexual abuse.  Devall also stated that prior to his September 16, 1994, interview of K.S. at her grade school, he had spoken with her about possible sexual abuse of D.D. by a grandfather.  During the first interview, Devall asked K.S. "very generic questions," such as "How is grandpa?"  He acknowledged having talked with K.S. about the allegations of sexual abuse by the grandfather during the first interview.  K.S. knew about the grandfather "possibly touching [D.D.] in a sexual way."  

During Devall's September 16, 1994, interview of K.S., K.S. told him that defendant had touched her in a bad way.  K.S. told him that defendant put his finger inside her "private" and "blood came out."   K.S. held up her right index finger when Devall asked her which finger defendant had put inside her private.  K.S. also told him that the incident hap­pened at nighttime, and the alleged sexual abuse occurred on more than one occa­sion--namely, when she bled and on the Fourth of July.  Devall stated that during the inter­view, K.S. was "very matter of fact" and "kept very good eye contact."  

K.S. also told Devall that defendant told her that he had to put medicine on her, and he put a bottle inside of her.  She also told Devall that when defendant touched her, her mother was downstairs sleeping.  K.S. also told him that her mother found the bloody underwear and took her to Patel's office. 

Devall also testified that he was familiar with studies and articles relating to child sexual abuse and he reads such litera­ture as part of his investigator duties.  Over defendant's objection, Devall testified that he has interviewed children who made allegations of sexual abuse who subsequently recanted.  Devall also testified that in his experience, recantation occurs in 50% of the cases.  Devall further testified regarding the reasons child victims recant their allegations of sexual abuse, as follows:

"Q.  [Prosecutor:]  And in your training and experience and the articles you have read and the education you have had in this area, what are some of the reasons given for why children recant?

[Defense counsel]:  I will object as to reasons given.  I don't believe this witness is qualified to testify in that respect.  What arti­cles he refers to[,] what he has read, whether they are experts in the area, I don't think he has been qualified as an ex­pert in the field of child psychology.

THE COURT:  I will allow the question.  Overruled.

A.  [Devall:]  It can be some of unsup­ported [
sic
] family, a family member that does not believe that the abuse occurred.  There has [
sic
] been cases that I have dealt with [where] the child has been away from a father or a mother for a period of time and has been scapegoated or blamed by the other family members and that child has changed the story.  There could be many reasons like that."

On cross-examination, Devall testified that on Septem­ber 16, 1994, he recorded the interview "[w]ord-for-word" using shorthand.  Later that same day, he typed the report (which the prosecutor used to refresh his recollection) and destroyed his handwritten notes.  He also stated that when he typed the report, he put it into a question and answer format.  He further stated that during the first interview with K.S., she knew he was there to discuss the grandfather's alleged sexual abuse of D.D. because D.D. had told her siblings.

Patel testified that on November 9, 1993, Annette brought K.S. to see him because Annette had noticed bleeding around K.S.' vaginal area.  Patel stated that he conducted a visual examination of K.S.' vaginal area and "found everything pretty normal."  He therefore did not conduct an internal exami­nation of K.S.  On redirect examination, Patel testified that it was possible, although unlikely, for someone to have an internal injury even though a visual examination appeared normal.

Cordoni testified that on October 25, 1994, he saw K.S. pursuant to a DCFS report of possible sexual abuse.  On that day, Cordoni took K.S.' medical history and completed a physical examination.  While taking her medical history, Cordoni asked K.S. if she knew why she was at the center.  K.S. told him that she was there because defendant touched her "down there."  K.S. simulta­neously pointed to her vaginal area.  Cordoni then asked her what defendant did to her, and she told him that defendant touched her and put medicine in her.  Cordoni asked K.S. if defendant touched her with his hand, and she said that defendant put his hand inside her and again pointed to her vaginal area.  Cordoni further stated that when he first met K.S. on October 25, 1994, she was "very open" and "somewhat playful."  However, when he questioned her about the alleged sexual abuse, she became "quiet and withdrawn."  

Cordoni then conducted a physical examination of K.S.  Cordoni found no physical signs of sexual abuse; however, he stated that 80% of child victims of sexual abuse have "a normal physical examination."  He further stated that, given K.S.' description of the sexual abuse, he would not expect to find any physical evidence of sexual abuse even a day after it occurred.  

Defendant testified and denied committing the crimes charged.  He also stated that he did not recall K.S. having bloody underwear.  Defendant's parents testified that although they regularly visited K.S. and her siblings, they never dis­cussed the sexual abuse allegations with the children.  On this evi­dence, the jury convicted defendant.  

II.  ANALYSIS

A.  Hearsay Statements Admitted Pursuant to Section 115-10

Defendant first argues that the trial court erred by admitting K.S.' statements to Devall regarding the sexual abuse pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 1992)).  We agree.

Section 115-10(b) of the Code provides that certain evidence shall be admitted as an exception to the hearsay rule under the following circumstanc­es:

"(1) The court finds in a hearing con­ducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement."  725 ILCS 5/115-10(b) (West 1992).

When conducting a section 115-10 hearing, a trial court must evaluate the totality of the circumstances surrounding the making of the hearsay statements.  Some factors that are important in making the reliability determination include the following:  (1) the child's spontaneity and consistent repetition of the incident; (2) the child's mental state; (3) use of termi­nology unexpected of a child of similar age; and (4) the lack of motive to fabricate.  
People v. West
, 158 Ill. 2d 155, 164, 632 N.E.2d 1004, 1008-09 (1994); 
People v. Peck
, 285 Ill. App. 3d 14, 23, 674 N.E.2d 440, 446 (1996).   

The State, as the propo­nent of out-of-court state­ments sought to be admitted pursuant to section 115-10 of the Code, bears the burden of establishing that the statements were reli­able and not the result of adult prompt­ing or manipulation.  
People v. Zwart
, 151 Ill. 2d 37, 45, 600 N.E.2d 1169, 1172 (1992).  A review­ing court will reverse a trial court's determi­nation pursuant to section 115-10 of the Code only when the record clearly demon­strates that the court abused its discretion.  
Zwart
, 151 Ill. 2d at 44, 600 N.E.2d at 1172. 

In this case, the circumstances surrounding K.S.' allegations made to Devall are particularly troubling.  Approxi­mately one month prior to K.S.' making statements to Devall implicating defendant, Devall interviewed her regarding alleged sexual abuse of an older sibling by a grandfather.  The State did not introduce any evidence regarding the substance of Devall's previous interview of K.S.  On cross-examination, Devall acknowl­edged that he could not specifically recall what he had asked K.S. during that prior interview.  

The circumstances here are similar to those in 
Zwart
, in which the alleged child victim had been interviewed on three prior occasions regarding alleged sexual abuse, and the State failed to introduce any evidence regarding the substance of those prior interviews.  The supreme court in 
Zwart
 concluded that "[w]ithout such evidence, it was impossible for the trial court to determine whether the victim was questioned in a sugges­tive manner or was encouraged to accuse the defendant of sexual abuse."  
Zwart
, 151 Ill. 2d at 44-45, 600 N.E.2d at 1172.  Although the prior interview in this case dealt with allegations of sexual abuse of a sibling by someone other than defendant, without any evidence of the substance of that interview, it is impossible to determine to what extent Devall discussed the alleged sexual abuse by the grandfather or whether Devall questioned K.S. in a suggestive manner or somehow intimated that defendant was also a sexual abuser.  See 
Zwart
, 151 Ill. 2d at 45, 600 N.E.2d at 1172 ("A trial court should not presume from a silent record that suggestive interview techniques were not used").  Evidence as to what transpired during the prior interview was particularly important here because K.S.' age made her susceptible to sugges­tion from outsiders.   The lesson of 
Zwart
 is clear.  When the declarant of a statement the State seeks to offer under section 115-10 of the Code has been previously interviewed concerning allegations of sexual misconduct and the previous interview is relatively recent with regard to the timing of the section 115-10 statement, the State must affirmatively establish the content of the previous interview and must affirmatively demonstrate that it did not compromise the reliability of the proffered statement.  If the State fails to offer 
any
 evidence regarding the substance and circumstances of the prior interview, the proffered statement should not be admitted unless other factors strongly suggest that the statement is reliable and not the result of suggestiveness by others.  Those individu­als--particular­ly law enforcement officers or child abuse investigators--inter­view­ing an alleged child victim should under­stand the importance of record­ing those interviews; it is simply not good enough to testify, "I don't recall what I asked the alleged victim."   

In a given case, a statement by a child to a third party may have been given under circumstances which suggest sufficient indicia of reliabili­ty, and yet an argument could be made--perhaps successfully--that the statement was a product of suggestive interviewing techniques or manipulation.  The best means to respond to this argument is for the child protective services investiga­tor to audiotape (or record in some fashion) his interview of the alleged victim.  Doing so provides the best evi­dence that no adult prompting or manipula­tion occurred, and trial courts can reasonably view the failure to do so as a negative factor when evaluating witness credibility and the State's claim that no improper interviewing techniques were used.  Considering that many of the issues in a section 115-10 hearing are close, and considering further the deference courts of review would give to a trial court's ruling denying admis­sion of the child's state­ment under section 115-10 of the Code, the State henceforth should be on notice of the risk it takes by not recording inter­views of alleged child victims.

The descriptive terms K.S. used in response to Devall's questions tend to lend support to the reliability of K.S.' statements.  For example, she re­ferred to her vagina as her "pri­vate" (a term indica­tive of a young girl not versed in the nomenclature of bodily organs).  See 
People v. Back
, 239 Ill. App. 3d 44, 59, 605 N.E.2d 689, 700 (1992).  However, K.S. did not make the out-of-court statements to Devall spontaneous­ly.  They occurred only during questioning by Devall after a report of sexual abuse against D.D. by a grand­father, a report of physical abuse against K.S. and her siblings by defendant, and a report of sexual abuse against D.D. by defendant.  Moreover, K.S.' state­ments to Devall and Cordoni were incon­sis­tent, which does not tend to support the reli­ability of her state­ments.  For exam­ple, during her physi­cal exami­na­tion by Cordoni, K.S. told him that defendant put medicine in her, whereas K.S. told Devall that defen­dant put a bottle inside her "pri­vate."

In addition, K.S. recanted her allegations against defen­dant a few months prior to the April 1997 section 115-10 hearing.  Regarding K.S.' motive to fabricate, Annette testified that K.S. told her that she had lied about defendant sexually abusing her because she was mad at defendant for hitting her and her sib­lings. 

Section 115-10 of the Code specifies that the time of the victim's statements must provide sufficient safeguards for their reli­abil­i­ty.  In this case, the State alleged that the abuse occurred between October and November 1993, and between June and July 1994.  K.S.' statement to Devall was not made until Septem­ber 16, 1994.  K.S.' delay in reporting defendant's ac­tions, standing alone, does not undermine the reliability of K.S.' statement.  See 
Zwart
, 151 Ill. 2d at 45-46, 600 N.E.2d at 1172-73; see also 
People v. Land
, 241 Ill. App. 3d 1066, 1081, 609 N.E.2d 1010, 1021 (1993) (the fact that the defendant was the child's father explained the several-month delay in reporting the abuse).  However, the delay becomes significant when considered in light of other factors which tend to show that K.S.' state­ments to Devall lacked reliability.

Viewing the totality of the circumstances surrounding the statements K.S. made to Devall, we conclude that the State failed to show the statements possessed sufficient "safe­guards of reliability" under section 115-10 of the Code.  Accord­ingly, we hold that the trial court abused its discretion by admit­ting the statements pursuant to that statutory provision, and our conclu­sion pre­cludes their admission on remand.

We further conclude that the remaining evidence was suffi­cient to support a finding of guilt beyond a reasonable doubt as to count I, which alleged that defendant committed an act of sexual penetration with K.S. using his finger.  Thus, we remand for a new trial on that count, noting that defen­dant faces no risk of double jeopar­dy on retrial on count I.  See 
People v. Cruz
, 162 Ill. 2d 314, 374, 643 N.E.2d 636, 664 (1994).  However, because the remaining evidence was not suffi­cient to support a finding of guilt beyond a reasonable doubt as to count II, which alleged that defendant committed an act of sexual penetration with K.S. using a bottle, defen­dant may not be retried on that count.

III.  ISSUES ON REMAND

We now consider issues likely to arise on remand.

A.  Hearsay Statements Admitted Pursuant to Section 115-13

Defendant argues that the trial court erred by admit­ting K.S.' statements to Cordoni pursuant to section 115-13 of the Code.  Specifi­cally, he contends that Cordoni's testimony violat­ed section 115-13 because K.S. did not see Cordoni for purposes of medical treatment or diagnosis but, rather, to compile evidence to be used in a subsequent prosecution.  We disagree.

Section 115-13 of the Code provides, as follows:

"In a prosecution for violation of [s]ection 12-13, 12-14, 12-15[,] or 12-16 of the 'Criminal Code of 1961[,'] statements made by the victim to medical personnel for purpos­es of medical diagnosis or treatment including descriptions of the cause of symp­tom, pain or sensations, or the inception or general char­acter of the cause or external source thereof insofar as reasonably perti­nent to diagno­sis or treatment shall be ad­mitted as an exception to the hearsay rule."  725 ILCS 5/115-13 (West 1992).

(Defendant here was being tried for aggravated criminal sexual assault, a violation of section 12-14 of the Criminal Code of 1961 (720 ILCS 5/12-14(b)(1) (West 1992)).)  Section 115-13 of the Code is a narrow codification of the common law rule permit­ting the use of hearsay evidence revealed during medical treat­ment.  
People v. Falaster
, 173 Ill. 2d 220, 229, 670 N.E.2d 624, 629 (1996).

In 
Falaster
, following the child victim's report of abuse to authorities, an assistant State's Attorney accompanied the child to an examining physician's office.  
Falaster
, 173 Ill. 2d at 233, 670 N.E.2d at 631 (Harrison, J., specially concurring, joined by McMorrow, J.).  Once there, a registered nurse obtained a medical history from the child prior to the physician's examina­tion.  During the taking of the history, the child described the sexual abuse and identified the defendant as her offender.  The trial court allowed the nurse's testimony regarding the child's statements.  On appeal, the defendant contended that section 115-13 did not authorize the use of the nurse's testimony because the victim was not at the doctor's office "for purposes of medical diagnosis or treatment."  In­stead, the defendant claimed that the victim underwent the examination solely as a means of developing evidence for use in a subsequent prosecution.  
Falaster
, 173 Ill. 2d at 228-29, 670 N.E.2d at 628-29.  In rejecting the defendant's contention, the supreme court wrote the following:

"
We
 
do
 
not
 
agree
 
with
 
the
 
defendant
 
that
 
the
 
diagnostic
 
purpose
 
of
 
the
 
examination
 
would
 
be
 
incompatible
 
with
 
its
 
investigatory
 
func­tion
.  We note, moreover, that the statute does not distin­guish between examining physi­cians and treating physicians."  (Emphasis added.)  
Falaster
, 173 Ill. 2d at 229, 670 N.E.2d at 629. 

In the present case, Devall took K.S. to be examined by Cordoni on October 25, 1994.  Cordoni testified that he obtained a medical history from K.S. and completed a physical examination of her.  Cordoni stated that the purpose of taking a medical history from K.S. "was to obtain information about the nature of the alleged sexual assault, exactly what happened to her[,] and get an idea of what possible potential findings or abnormalities might be present."  Cordoni further stated that a medical history is relevant to both his examination and diagnosis of a patient.  During the taking of K.S.' medical history, K.S. described to Cordoni the sexual abuse and identified defendant as her offend­er.  

Consistent with the supreme court's decision in 
Falaster
, we conclude that the examination conducted in this case was for a purpose within the scope of section 115-13 of the Code.  According­ly, we hold that the trial court did not err by admit­ting Cordoni's testimony regarding K.S.' state­ments pursu­ant to that section. 

Having so concluded, we also reject defendant's conten­tion that if section 115-13 of the Code "is interpreted to permit the admission of such statements, that section violates the constitutional right of confrontation."  In 
People v. Roy
, 201 Ill. App. 3d 166, 178, 558 N.E.2d 1208, 1216-17 (1990), this court addressed this issue and held that statements properly admitted pursuant to section 115-13 of the Code do not deny a defendant his confrontation rights.  In so concluding, this court wrote, as follows:

"Section 115-13 is a codification of the firmly rooted common law hearsay exception allowing statements describing medical histo­ry, symptoms, pain, or sensa­tions made for purposes of medical diagnosis or treat­ment.  The assumption underlying both section 115-13 and the common law exception is that the desire for proper diagnosis or treatment outweighs any motive to falsify.  Mere codi­fication of the common law rule does not change these assumptions, nor are they negat­ed when minor children are involved."  
Roy
, 201 Ill. App. 3d at 179, 558 N.E.2d at 1217.

B.  The Trial Court's Decision To Allow the DCFS Investigator

To Testify Regarding Recantation by Sexually Abused Children

Defendant argues that the trial court erred by allowing Devall to testify about the frequency with which child victims of sexual abuse recant and the reasons for such recanta­tion.  Specifically, he contends that Devall's testimony consti­tuted an improper comment on the veracity of K.S.' trial testi­mony and invaded the province of the jury to assess K.S.' credibility.  We agree. 

A trial court should allow expert testimony only if (1) the proffered expert has knowledge and qualifications uncommon to laypersons that distinguish him as an expert; (2) the expert's testimony would help the jury understand an aspect of the evi­dence that it otherwise might not understand, without invading the province of the jury to determine credibility and assess the facts of the case; and (3) the expert's testimony would reflect generally accepted scientific or technical principles.  
People v. Enis
, 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164 (1990); 
People v. Wilson
, 246 Ill. App. 3d 311, 320, 615 N.E.2d 1283, 1288 (1993).  

Section 115-7.2 of the Code allows admission, as evidence, of the testimony of an expert qualified by the trial court relating to any recognized and accepted form of posttraumatic stress syndrome.  725 ILCS 5/115-7.2 (West 1992).  This court has previously applied this statute to allow experts to explain or testify with respect to certain symptoms or behavioral characteristics of child victims of sexual abuse, including (1) abnormal fears; (2) nightmares; (3) acting out sexually with toys or other children; (4) precocious sexual knowledge and the ability to relate explicit sexual behavior; (5) excessive mastur­bation; (6) regressive behavior, including bed-wetting; (7) being fearful and clinging to certain people; (8) tantrums and sudden mood swings; (9) complaints of pain in the vaginal or anal areas; (10) self-destructive behavior; (11) problems communicating with others; (12) inability to trust others; (13) failure in school; and (14) initial denial of the abuse.  See 
People v. Turner
, 241 Ill. App. 3d 236, 244-45, 608 N.E.2d 906, 912-13 (1993) (allow­ing police officer's testimony regarding the tendency of child sexual abuse victims to initially deny that they have been sexually abused); 
People v. Wasson
, 211 Ill. App. 3d 264, 271, 569 N.E.2d 1321, 1326 (1991) (allowing therapist's testimo­ny regarding behav­iors indicative of sexual abuse and application of such knowledge to the facts of the case); 
People v. Roy
, 201 Ill. App. 3d 166, 180, 558 N.E.2d 1208, 1218 (1990) (allowing pediatrician's testimony as to behavioral character­istics of child victims of sexual abuse under the label of posttraumatic stress syndrome); 
People v.
 Coleman
, 205 Ill. App. 3d 567, 585, 563 N.E.2d 1010, 1021 (1990) (allowing testimony of nurse, physi­cian, and thera­pist regarding behavioral characteris­tics of child victims of sexual abuse).  

However, in 
Wilson
, 246 Ill. App. 3d at 322, 615 N.E.2d at 1289, this court upheld the trial court's rejection of the defendant's proffered expert testimony concerning the reliability of child-victim testimony, specifically child victims' allegedly poor memories and proclivities to invent accusations.  In that case, the defendant's expert testified in an offer of proof regard­ing his findings in studies about how the limited cognitive ability of child victims taints their recollection of events.  In uphold­ing the trial court's ruling, this court concluded that the proffered testimony (1) would not have provided the jury with much informa­tion beyond the knowledge of an average layperson, and (2) would have severely impinged on the province of the jury to determine credibility and assess the facts of that case. 

The 
Wilson
 court noted that the supreme court in 
Enis
 had addressed a similar situation when the defendant in that case offered an expert to testify about the reliability of eyewitness testimony, as follows:

"Although the [
Enis
] court noted that much of the expert's testimony would have resolved purported 'myths' about eyewitness testimony that were not pertinent to that case, the court wrote the follow­ing:

'We caution against the overuse of expert testimo­ny.  Such testimony, in this case concerning the unreli­ability of eyewitness testimony, could well lead to the use of ex­pert testimony concerning the unre­liabil­ity of other types of testi­mony and, even­tually, to the use of experts to testify as to the unre­liability of expert testimony.  So-called experts can usually be ob­tained to support most any posi­tion.  The determi­na­tion of a law­suit should not depend upon which side can present the most or the most convincing expert wit­nesses.  We are con­cerned with the reli­abil­ity of eyewitness expert testi­mony [citations], whether and to what degree it can aid the jury, and if it is nec­essary in light of defendant's ability to cross-exam­ine eyewitnesses.  An expert's opinion concerning the unreli­abil­i­ty of eyewitness testimony is based on statistical averages.  The eye­wit­ness in a particular case may well not fit within the spectrum of these averages.  It would be [inap­pro­priate] for a jury to conclude, based on expert testimony, that all eyewit­ness testimony is unreli­able.'"  
Wil­son
, 246 Ill. App. 3d at 321, 615 N.E.2d at 1289, quoting 
Enis
, 139 Ill. 2d at 289-90, 564 N.E.2d at 1165.     

In the present case, we hold that Devall's testimony regarding the frequency of and reasons for recantation by child victims of sexual abuse (1) did not aid the jury in reach­ing its conclusion, and (2) severely impinged upon the prov­ince of the jury to determine credibility and assess the facts of the case.  Devall testified that, in his experience, about 50% of children who made allegations of sexual abuse subsequently recanted those allega­tions.  He further testified that based upon his education and training, including articles he had read, some of the reasons child victims recant include an unsupportive family and the child feeling blamed for the abusive parent's absence from the family.  However, in this case, 
no
 evidence was presented that K.S. recanted her allega­tions against defendant because of an unsupportive family or because she felt like a scapegoat.  Thus, Devall's testimony had nothing to do with K.S.' credibility.  See 
Enis
, 139 Ill. 2d at 289-90, 564 N.E.2d at 1165 (expert opinion testimony would not have aided the trier of fact in reaching its conclusion when the testimony regarding purported "myths" of eyewitness testimony had little or no similarities to the eyewitnesses in that case). 

When stripped to its basic level, Devall's testimony regarding recantation by child victims constitutes a commentary on K.S.' credibili­ty, similar to eyewitness opinion testimony.  In essence, Devall was being asked to give his opinion on the believability of K.S., the child witness in this case.  We view testimony regarding symptoms and behavioral charac­teristics as being different because such testimony does not constitute direct commentary on the child witness' believ­ability.  Instead, that testimony constitutes circumstantial evidence--that is, it describes certain behaviors shown by sexually abused children; thus, if other evidence shows the victim in a particu­lar case engaged in those behaviors, a jury could reasonably view that evidence as supporting the State's claim that the child had been sexually abused.  Just as trial courts reject defense attempts to offer purported expert testimony attacking witnesses' credibili­ty, so should trial courts reject the State's attempt to use purported expert testimony to bolster witnesses' credi­bil­i­ty.  These are matters best left to the trier of fact.  Accord­ingly, we hold that the trial court abused its discretion by allow­ing Devall's testimony regarding recantation by child victims of sexual abuse.  

IV.  CONCLUSION

For the reasons stated, we reverse and remand for a new trial consistent with the views expressed herein.

Reversed and remanded.      

GREEN and McCULLOUGH, JJ., concur.