NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 170632-U

NO. 4-17-0632

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 3, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| SERGIO A. MAYEN, | ) | No. 16CF172 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) the State presented sufficient
evidence to prove defendant guilty beyond a reasonable doubt, (2) the trial court
did not abuse its discretion by admitting the child victim's hearsay statements as
substantive evidence under section 115-10, and (3) defendant forfeited his
argument that the trial court failed to properly admonish prospective jurors
pursuant to Illinois Supreme Court Rule 431(b).

¶ 2    A jury found defendant, Sergio A. Mayen, guilty of predatory criminal sexual

assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and aggravated criminal sexual abuse

(720 ILCS 5/11-1.60(c)(1)(i) (West 2014)). The trial court sentenced him to concurrent terms of

12 and 4 years' imprisonment, respectively.

¶ 3    Defendant appeals, arguing (1) the State failed to prove him guilty beyond a

reasonable doubt, (2) the trial court erred in admitting hearsay evidence under section 115-10 of

the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/115-10 (West 2016)), and (3) the trial court erred by failing to properly admonish the prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. The Charges

¶ 6         The State charged defendant by amended information with predatory criminal sexual assault of a child (count I) (720 ILCS 5/11-1.40(a)(1) (West 2014)) and aggravated criminal sexual abuse (count II) (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)). Count I alleged that defendant, a person 17 years of age or older (born December 10, 1983), "on or about January 1, 2016, through January 31, 2016," touched the vagina of A.M., a person under the age of 13 (born October 6, 2006), with his hand for the purpose of sexual gratification. Count II alleged that defendant, during the same time frame, committed an act of sexual conduct with A.M. in that he touched A.M.'s body for the purpose of sexual gratification.

¶ 7                                    B. The Section 115-10 Hearing

¶ 8         In March and April 2017, the trial court conducted a hearing on the State's motion to admit hearsay evidence—in the form of a video-recorded interview with A.M. conducted at the Livingston County Children's Advocacy Center (CAC) on February 26, 2016—pursuant to section 115-10 of the Criminal Procedure Code (725 ILCS 5/115-10 (West 2016)). At the hearing, the State presented the testimony of Cara Vock, the CAC employee who interviewed A.M.

¶ 9         Vock was employed as a "child and family advocate" and "backup forensic interviewer." She testified as to her training and described the CAC office where she interviewed A.M. Vock explained that, on the day of the interview, another family advocate brought A.M.

into the interview room prior to the interview "so [A.M.] was aware of the camera and the environment that she would speak to me as the forensic interviewer in." Vock testified that her only contact with A.M. prior to the interview was a brief introduction outside of the interview room. Vock testified that she asked A.M. "open-ended, non-leading questions," and she described A.M. as being generally "playful and joyful," but "closed off and uncomfortable" when discussing the alleged abuse.

¶ 10        On cross-examination, Vock explained that she first learned of A.M.'s case when she was contacted by Lee Boedigheimer with the Department of Children and Family Services (DCFS) to set up an interview with A.M. She could not recall what Boedigheimer had told her about the case or whether he had given her any documents. Vock testified that she met with a detective and Boedigheimer prior to the interview for "a prestaffing interview to understand any outcry statements or allegations that had been said by a child regarding abuse." Vock further indicated that she may have been given a police report prior to the interview but she could not recall with certainty.

¶ 11        In the video, which is discussed in greater detail below, A.M. asserts that defendant repeatedly touched her "private parts" with his hand in their house when her mother was at work and none of the other house members were nearby.

¶ 12        After listening to the arguments of the parties and taking the State's motion under advisement, the trial court determined that the time, content, and circumstances of A.M.'s out-of-court statements in the CAC interview provided sufficient safeguards of reliability to warrant admission of the video, assuming A.M. was available for cross-examination. The court specifically found that (1) A.M.'s statements were consistent, (2) A.M.'s mental state was

normal for a child her age, (3) A.M. used language expected of a child her age, (4) A.M. had no motive to lie, and (5) Vock's questioning was not unduly suggestive or coercive.

¶ 13                 C. Jury Trial

¶ 14        On June 26, 2017, defendant's case proceeded to a jury trial.

¶ 15                 1. *Voir Dire*

¶ 16        During *voir dire*, the trial court separated the venire into two groups and separately admonished the groups regarding the legal principles enumerated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). After reciting all four principles, the court asked the jurors in both groups to raise their hands if they understood the principles. The record shows all prospective jurors raised their hands. The court then asked the jurors in both groups to raise their hands if they accepted the principles. Again the record reflects all prospective jurors raised their hands.

¶ 17                 2. *The State's Evidence*

¶ 18                 a. A.M.

¶ 19        A.M. (who was 10 years old and had completed fourth grade at the time of her testimony) was the State's sole witness. At the time of the alleged abuse, A.M. lived in a house in Cullom with her mother (Brandi Bell), nine-year-old sister Olivia, seven- and five-year-old brothers Cooper and Georgie, respectively, defendant, and "some man." Defendant was dating Bell and had lived with the family for "years." Bell worked frequently, leaving defendant to watch the children. A.M. testified defendant would sometimes "rub and touch" her private parts when Bell was at work. When asked where the private parts on the body were located, A.M. responded, "On your chest, on your bottom area, and then behind your back on your bottom area." A.M. acknowledged that "those bottom areas" were "the areas that you go to the bathroom

- 4 -

out of." She indicated that the "adult words" for the bottom area and chest area were "vagina and butt" and "boobs," respectively. A.M. testified that defendant touched "all of [her private areas]" with his hand. The contact consisted of defendant rubbing and touching her. She stated that she was always wearing clothes and underwear when defendant touched her, and he would touch her both on top of and underneath her clothes and underwear. The alleged abuse occurred only in the house when Bell was at work and "[i]t could happen anywhere in the house. Just the kids weren't near me." A.M. could not identify any specific dates or times the alleged abuse occurred.

¶ 20    On cross-examination, A.M. acknowledged that the prosecutor had asked her the same questions the day before trial. A.M. testified that she had discussed the case with her mother and sister prior to trial, but she did not contemporaneously tell her mother, her teacher, or her doctor about the alleged abuse. A.M. admitted that she "hated" defendant and did not like him living with her mother and siblings. A.M. agreed with defense counsel's assertion that defendant no longer lived with them after the date she gave her video-recorded statement at the CAC.

¶ 21    b. CAC Interview

¶ 22    Following A.M.'s testimony, her video-recorded CAC interview was admitted into evidence and played for the jury.

¶ 23    A.M. was nine years old and in third grade at the time of the interview. She was living with the biological father and stepmother of her half-brother Cooper and half-sister Olivia. A.M. had been living there since "the incident," which involved defendant driving while intoxicated with her and her siblings in the vehicle. Prior to "the incident," A.M. lived in a house in Cullom with Bell, defendant (who she referenced as her "stepdad"), her half-sister Olivia, half-brother Cooper, and brother Georgie. A.M. lived there full-time; Oliva and Cooper stayed

with their biological father every other week. A.M. and Olivia shared a room, Cooper and Georgie shared a room, and Bell and defendant shared a room.

¶ 24     When asked about her relationships with her mother and defendant, A.M. stated that she got along very well with her mother but did not get to see her often because she worked long hours. As for defendant, A.M. described him as "very mean," and she said that she had "no fun memories" with him. She claimed that defendant would hit her and her mother. Vock (the CAC interviewer) produced a diagram of a female body—front and back—and asked A.M. to circle the parts of the body defendant had hit. While circling parts of the diagram, A.M. asked, unprompted, "those I did get touched by [defendant], so would that kind of count?" (It appears from our review of the video that A.M. was alluding to her chest and vagina.) Vock directed A.M. to circle the areas that defendant had touched.

¶ 25     After A.M. completed marking on the diagram, Vock asked A.M. for the names of the body parts defendant had allegedly touched. A.M. said she was not comfortable saying the name because "we don't use those words." Instead of assigning a word to the body parts, Vock suggested A.M. simply assign a letter. A.M. then assigned the letter "N" to the chest, "M" to the vagina, and "U" to the buttocks. A.M. asserted that defendant would "rub and pull" all three body parts with his hand "almost all the time." A.M. stated that she was always wearing clothes and underwear when defendant touched her, and defendant would touch her both on top of and underneath her clothing and underwear. She claimed that defendant touched "N," "M," and "U" in the same manner.

¶ 26     A.M. could not remember when the abuse began. She estimated that the last time it occurred was "two to three—four weeks ago." She explained that she would attempt to get away from defendant when he touched her, but he would grab her and warn her not to tell

anyone. A.M. said that she did not tell anyone about the abuse because she was scared defendant would hurt her. A.M. stated that the abuse would occur in her room when Olivia was doing something else, and in defendant's room "when [A.M.] was doing his feet." A.M. explained that defendant frequently had her scratch his feet with a Barbie hairbrush. She said that the abuse could occur "sometimes almost every place" in his room; in A.M.'s room, the abuse occurred "by [A.M.'s] bed, by [the] T.V., by [the] window when it was shut, by Olivia's bed, by the closet, and by the door that leads downstairs."

¶ 27        A.M. maintained that defendant was always fully clothed when he touched her and he never asked her to touch any part of his body (besides his feet, as discussed above). When asked if defendant had ever exposed his penis to her, A.M. responded that the only time she had seen defendant's penis was when she accidentally walked in on him in the bathroom.

¶ 28                              3. *Defendant's Evidence*

¶ 29                                a. Clifton Frost

¶ 30        Clifton Frost lived with defendant, Bell, and the four children when the alleged abuse occurred and had "lived with them for a while." Frost suffered from "seizures real bad" and "couldn't like go out *** and be by [himself]" so he "mostly stayed in the apartment" and watched television or "just sat around." Frost testified that he never observed any "unusual" behavior or contact between defendant and the children.

¶ 31                                b. Defendant

¶ 32        Defendant testified that he had been living with Bell and her children for approximately four years when the alleged abuse occurred. He was not employed and stayed home to care for the children and Frost when Bell was at work. Defendant described the children as generally well-behaved, and he believed he had a good relationship with A.M. Defendant

acknowledged that he disciplined the children occasionally, but he denied ever hitting or abusing them in any manner. Defendant testified that he never touched A.M. inappropriately and never received any complaints from the children or Bell regarding his interactions with the children.

¶ 33                                                    4. *Verdict*

¶ 34            The jury found defendant guilty of both counts.

¶ 35                              D. Posttrial Motion and Sentencing

¶ 36            On June 27, 2017, defendant filed a motion for a new trial, arguing (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt and (2) the trial court erred by admitting the video-recorded interview under section 115-10 of the Criminal Procedure Code. The trial court denied defendant's motion.

¶ 37            The trial court sentenced defendant to 12 years' imprisonment on count I and 4 years' imprisonment on count II, with the sentences to be served concurrently.

¶ 38            This appeal followed.

¶ 39                                         II. ANALYSIS

¶ 40            Defendant argues (1) the State failed to prove him guilty of the charged offenses beyond a reasonable doubt, (2) the trial court erred in admitting hearsay evidence under section 115-10 of the Criminal Procedure Code (725 ILCS 5/115-10 (West 2016)), and (3) the trial court erred by failing to properly admonish the prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 41                              A. Sufficiency of the Evidence

¶ 42            Defendant argues the State failed to prove him guilty of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)) beyond a reasonable doubt. Specifically, he contends

the evidence was insufficient "where the State's case rested entirely on the uncorroborated, implausible, and contradicted testimony of a single witness."

¶ 43                                    1. *Standard of Review*

¶ 44          When a defendant challenges the sufficiency of the evidence against him on appeal, a reviewing court must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the charged offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "It is not the role of the reviewing court to retry the defendant." *Id.* Rather, it is the trier of fact's responsibility "to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 45          "The testimony of a single witness is sufficient to convict if the testimony is positive and credible," and we will not reverse a conviction "simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Gray*, 2017 IL 120958, ¶ 36. Where, as here, the finding of guilt depends on eyewitness testimony, "a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* "Under this standard, the eyewitness testimony may be found insufficient 'only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.' " *Id.* (quoting *People v. Cunningham*, 212 Ill. 2d 274, 280, 818 N.E.2d 304, 308 (2004)).

¶ 46                          2. *Essential Elements of the Charged Offenses*

¶ 47    To convict defendant of predatory criminal sexual assault of a child (count I), the State had to prove three elements beyond a reasonable doubt: (1) defendant knowingly committed an act of contact, however slight, between his hand and A.M.'s vagina for the purpose of sexual gratification when (2) he was 17 years of age or older and (3) A.M. was under the age of 13. 720 ILCS 5/11-1.40(a)(1) (West 2014). To convict defendant of aggravated criminal sexual abuse (count II), the State again had to prove three elements beyond a reasonable doubt: (1) defendant committed "an act of sexual conduct" with A.M. when (2) he was 17 years of age or older and (3) A.M. was under the age of 13. 720 ILCS 5/11-1.60(c)(1)(i) (West 2014). "Sexual conduct" is defined as "any knowing touching or fondling by *** the accused, either directly or through clothing, of *** any part of the body of a child under 13 years of age *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2014).

¶ 48    It is undisputed defendant was 17 years of age or older and A.M. was under the age of 13 at the time of the alleged offenses. Therefore, the only issue is whether the State—through A.M.'s direct testimony and the video-recorded CAC interview—proved, with respect to count I, that defendant committed "an act of contact" between his hand and A.M.'s vagina for the purpose of sexual gratification and, with respect to count II, that defendant committed "an act of sexual conduct" (*i.e.*, touched any part of A.M.'s body for the purpose of sexual gratification).

¶ 49                    3. *The Evidence Was Sufficient*

¶ 50    In both her direct testimony and CAC interview, A.M. alleged defendant touched all of her private areas, including her vagina, with his hand. She testified the touching occurred when she was fully clothed, and defendant would "rub and touch" her both on top of and underneath her clothes and underwear. A.M. further testified that the abuse occurred only in the

house when her mother was at work and none of the other household members were nearby. Even though defendant's testimony contradicted A.M.'s allegations, her testimony was nonetheless sufficient to prove beyond a reasonable doubt that defendant (1) touched A.M.'s vagina with his hand for the purpose of sexual gratification and (2) touched any part of her body for the purpose of sexual gratification. See *Gray*, 2017 IL 120958, ¶ 36 ("The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant."); *People v. Burton*, 399 Ill. App. 3d 809, 813, 927 N.E.2d 240, 243 (2010) ("A defendant's intent to arouse or gratify himself sexually can be inferred solely from the nature of the act.").

¶ 51        Defendant raises four arguments to support his contention that the State failed to carry its burden of proof. We address each in turn.

¶ 52        First, defendant argues A.M.'s testimony lacked credibility because it was "not corroborated by any occurrence witnesses or corroborating scientific evidence." Beginning with the lack of scientific evidence, we fail to see, and defendant does not explain, what type of "scientific evidence" could have corroborated A.M.'s testimony, given that she alleged defendant touched her with his hand. As for the lack of corroborating witnesses, defendant argues it is implausible that the alleged abuse occurred in multiple rooms, including A.M.'s shared bedroom, without any of the household members noticing. We disagree. In fact, it is entirely plausible that defendant would choose to abuse A.M. only when he was certain that no one else in the house would witness his actions. Moreover, A.M. stated in her CAC interview that two of her three siblings, including the sibling with whom she shared a bedroom, stayed with their biological father every other week, making it easier for defendant to be alone with A.M. during those

- 11 -

weeks. Thus, a fact-finder could reasonably believe A.M.'s testimony despite the lack of corroboration.

¶ 53        Second, defendant argues the video-recorded interview was insufficient to prove that he touched A.M.'s vagina because, while she assigned the letter "N" to describe her breasts, "it was not clear from the video what letters A.M. assigned to the body parts of 'M' and 'U.' " However, in our review of the video we find it clearly shows that A.M. assigned the letter "M" to her vagina, and she stated that defendant touched "M" with his hand, both on top of and underneath her clothing and underwear.

¶ 54        Third, defendant argues that because (1) the prosecutor had asked A.M. the same questions the day before trial and (2) A.M. had discussed the case with her mother and sister prior to trial, "no rational trier of fact could have found [him] guilty of the charges where A.M.'s testimony and [the] CAC interview were influenced by adults." We disagree. Although A.M. testified that she had met with the prosecutor the day before trial, she stated the prosecutor did not tell her what to say in response to his questions but simply told her "to tell the truth." Moreover, the fact that A.M. discussed the case with her mother and sister prior to her testimony does not lead one to conclude that testimony was somehow tainted. A fact-finder could reasonably conclude that even though she had previously discussed the case with adults, A.M. testified truthfully. We note that defendant argues the CAC interview was influenced by adults because A.M. spoke to DCFS and the police prior to the interview; however, this evidence was only presented to the court at the section 115-10 pretrial hearing, not to the jury at defendant's trial. In addition, defendant's claims that A.M. was interviewed by DCFS and the police are unsubstantiated, and he fails to provide any citation to the record in support.

¶ 55        Fourth, defendant argues "A.M.'s testimony was also unreliable because it was vague as to when the purported abuse began and ended." In her CAC interview, A.M. could not say when the abuse first occurred. Asked when the abuse last occurred, A.M. replied, "two to three—four weeks ago." While we agree that A.M. did not provide a date when the abuse began, we disagree that this omission would prevent a rational fact-finder from concluding the abuse nonetheless occurred. It was the jury's responsibility to weigh A.M.'s testimony, and, when viewed in the context of her statement that the abuse occurred "almost all the time," we cannot say her lack of specificity as to the timeframe rendered A.M.'s testimony unbelievable. See *People v. Letcher*, 386 Ill. App. 3d 327, 333, 899 N.E.2d 315, 321 (2008) (noting that the victim of repeated abuse by a resident of the victim's home is typically "unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults") (Internal quotation marks omitted.).

¶ 56        Accordingly, we conclude that the evidence, viewed in the light most favorable to the State, was sufficient to prove defendant guilty of predatory criminal sexual assault of a child and aggravated criminal sexual abuse beyond a reasonable doubt.

¶ 57                    B. Admission of Child Victim's Hearsay Statements

¶ 58        Defendant argues the trial court erred in admitting hearsay statements—the video-recorded interview—as substantive evidence under section 115-10 of the Criminal Procedure Code (725 ILCS 5/115-10 (West 2016)). Specifically, defendant notes that "the State failed to introduce the substance and circumstances of A.M.'s prior interviews about the alleged abuse, and the content of A.M.'s CAC interview was unreliable."

¶ 59        We review a trial court's decision to admit hearsay evidence under section 115-10 for an abuse of discretion (*People v. Bowen*, 183 Ill. 2d 103, 120, 699 N.E.2d 577, 586 (1998))

meaning we will reverse only "when the trial court's determination is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court." *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 57, 68 N.E.3d 986.

¶ 60        The relevant portion of section 115-10 provides as follows:

"(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13 ***, the following evidence shall be admitted as an exception to the hearsay rule:

***

(2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability ***." 725 ILCS 5/115-10(a)(2), (b)(1) (West 2016).

¶ 61        The State, as the proponent of the out-of-court statement, bears the burden of establishing that the statement is reliable and not the result of adult prompting or manipulation. *People v. Simpkins*, 297 Ill. App. 3d 668, 676, 697 N.E.2d 302, 307 (1998). When determining whether the State has established the reliability of a given statement, a court "must evaluate the totality of the circumstances surrounding the making of the hearsay statements." *Id.* Some important, but nonexclusive, factors to consider include "(1) the spontaneity and consistent

- 14 -

repetition of the statement; (2) the mental state of the child in giving the statement; (3) the use of terminology not expected in a child of comparable age; and (4) the lack of a motive to fabricate." *Bowen*, 183 Ill. 2d at 120 (citing *People v. West*, 158 Ill. 2d 155, 164, 632 N.E.2d 1004, 1009 (1994)). When reviewing the trial court's reliability determination, we consider only the evidence presented at the section 115-10 pretrial hearing, not the evidence presented at trial. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 85, 5 N.E.3d 328.

¶ 62        Here, in determining the time, content, and circumstances of A.M.'s out-of-court statements were sufficiently reliable to warrant admission of the video-recorded interview, the trial court specifically found that (1) the statements were consistent, (2) A.M.'s mental state was normal for a child her age, (3) A.M. used language expected of a child her age, (4) she had no motive to lie, and (5) Vock's questioning was not unduly suggestive or coercive. Thus, the record shows the court considered the factors enumerated in the case law, and we find, after considering the totality of the circumstances, that the court did not abuse its discretion by admitting the hearsay evidence.

¶ 63        Defendant, relying on *People v. Zwart*, 151 Ill. 2d 37, 600 N.E.2d 1169 (1992), argues the trial court could not have found the out-of-court statements reliable because "the State failed to introduce the substance and circumstances of A.M.'s prior interviews about the alleged abuse."

¶ 64        In *Zwart*, the supreme court concluded that the trial court abused its discretion by admitting the three-year-old victim's out-of-court statements under section 115-10 due to the "substantial adult intervention" that preceded the making of the statements. *Id.* at 44-46. There, the victim's mother noticed blood in the victim's diaper and signs that she was experiencing pain in the area, but the victim said nothing about sexual abuse. *Id.* at 40. Instead, it was not until one

week later when the victim informed her mother that the defendant had performed sexual acts on her. *Id.* at 41. During the intervening week, the victim had been interviewed by a hospital counselor, a DCFS worker, and a police officer; additionally, in her first interview, she denied having been sexually abused. *Id.* at 44-45.

¶ 65 The supreme court found that the circumstances surrounding the victim's initial outcry were "particularly troubling" because they raised questions about the true source of her allegations against the defendant. *Id.* at 44. The troubling nature of the circumstances was compounded by the fact that the three-year-old victim would be highly susceptible to suggestion. *Id.* at 45. However, the questions could not be answered because the State failed to present any evidence regarding the substance of the three interviews that preceded the victim's initial outcry, and the trial court found that the victim was incompetent to testify. *Id.* at 44-45. Thus, because "it was impossible for the trial court to determine whether the victim was questioned in a suggestive manner or was encouraged to accuse the defendant of sexual abuse[,]" the supreme court held that the statements were unreliable and the trial court abused its discretion by admitting them into evidence under section 115-10. *Id.* at 44-46.

¶ 66 The facts in the instant case differ from those in *Zwart* in three critical respects. First, the victim in *Zwart* initially alleged sexual abuse had occurred *after* three separate interviews with authorities. Here, defendant fails to point to anything in the record that demonstrates A.M. spoke with authorities before she first alleged defendant had sexually abused her. Thus, this case does not carry with it the same concern that was present in *Zwart*, namely, that the initial allegation of abuse may have been the product of "suggestive" questioning or even "encourage[ment] to accuse the defendant." *Id.* at 44-45.

¶ 67    Second, the victim in *Zwart* was *interviewed* by authorities on three separate

occasions. *Id.* Here, there is nothing in the record to suggest A.M. was ever interviewed before

her CAC interview. Vock testified that she became aware of the case after being contacted by

DCFS, which had been informed of the case after being contacted by the police. However, the

record contains scant evidence of A.M.'s contact with DCFS and the police prior to the CAC

interview and defendant is unable to provide any factual support for his assertion that there were

"prior interviews" of A.M. This court has stated:

> "The lesson of *Zwart* is clear. When the declarant of a
>
> statement the State seeks to offer under section 115-10 of the
>
> [Criminal Procedure] Code has been previously interviewed
>
> concerning allegations of sexual misconduct and the previous
>
> interview is relatively recent with regard to the timing of the
>
> section 115-10 statement, the State must affirmatively establish the
>
> content of the previous interview and must affirmatively
>
> demonstrate that it did not compromise the reliability of the
>
> proffered statement." *Simpkins*, 297 Ill. App. 3d at 677.

Here, there is nothing in the record to suggest that A.M. was "previously interviewed concerning

allegations of sexual misconduct" (*id.*), and defendant has not cited to any authority requiring the

State to affirmatively establish that the declarant was *not* interviewed prior to the making of the

proffered statement.

¶ 68    Third, the *Zwart* court found that the lack of evidence as to the substance of the

three interviews "was particularly important" to its determination for two reasons: (1) "the

victim's age made her particularly susceptible to suggestion" and (2) "the defendant was unable

- 17 -

to question the victim about the interviews at trial because the trial court found the victim incompetent to testify." *Zwart*, 151 Ill. 2d at 45. Neither of those "particularly important" factors were present in the instant case. A.M. was nine years old at the time of her interview (the *Zwart* victim was three years old) and she testified at trial, giving defendant the opportunity to question her about any prior discussions she may have had with authorities prior to her CAC interview.

¶ 69        Defendant also argues that "the content of A.M.'s CAC interview was unreliable." He specifically points to the following in support of this arugment: (1) Vock asked leading questions, (2) A.M. appeared inattentive and reluctant to answer Vock's questions, and (3) A.M. had a motive to lie.

¶ 70        Vock testified at the section 115-10 pretrial hearing that she asked "open-ended, non-leading questions," and the trial court specifically found that Vock did not ask "unduly suggestive or coercive" questions. The record supports this finding. The few instances in which Vock asked leading questions were limited to when A.M. made it clear she did not want to discuss the abuse further. It appears Vock asked the leading questions in an effort to keep A.M. talking, not in an effort to suggest a particular answer.

¶ 71        The trial court also found that A.M.'s mental state during the interview was normal for a child her age. Defendant argues A.M.'s general inattentiveness and reluctance to discuss the abuse supports a finding of unreliability. We disagree. We do not find it unusual that a nine-year-old child would have difficulty focusing on a particular topic for nearly 90 minutes, and defendant fails to explain how A.M.'s inattentiveness made her statements less reliable; A.M. gave topic-appropriate answers to the questions asked, and she never appeared so inattentive that she did not understand the questions. Moreover, there is nothing unusual about the victim of sexual abuse being reluctant to discuss the abuse. Thus, we cannot say that it would

- 18 -

have been arbitrary or fanciful for the court to conclude that A.M.'s statements were reliable despite her alleged inattentiveness and reluctance to discuss the abuse.

¶ 72　　　　Finally, the trial court found that A.M. had no motive to lie. Defendant disagrees, noting that during her interview, A.M. "stated that [defendant] disciplined her, she had 'no fun times' with him, and that he was mean 'times ten' to her." Even if we were to accept defendant's position, having a motive to lie is only one of several nondispositive factors to consider. The trial court determined that the remaining factors favored a finding of reliability, and this determination is supported by the record.

¶ 73　　　　Accordingly, having considered the totality of the circumstances, we conclude that the trial court did not abuse its discretion by admitting A.M.'s video-recorded CAC interview as substantive evidence under section 115-10 of the Criminal Procedure Code.

¶ 74　　　　　　　　　　　　C. Juror Admonishments

¶ 75　　　　Defendant argues the trial court erred by failing to properly admonish the prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Specifically, he contends the court "erred in collapsing the Rule 431(b) admonishments into a single statement of law." Defendant acknowledges he forfeited this argument by not objecting at trial, but asks us to consider it under the first prong of the plain-error doctrine. Because we find the trial court did not err in the manner it admonished the venire pursuant to the Rule 431(b), we decline defendant's request and honor his forfeiture of this argument.

¶ 76　　　　"The plain-error doctrine permits a reviewing court to by-pass normal rules of forfeiture and consider '[p]lain errors or defects affecting substantial rights *** although they were not brought to the attention of the trial court.' " *People v. Eppinger*, 2013 IL 114121, ¶ 18, 984 N.E.2d 475 (quoting Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). Plain-error review is

appropriate "when *** a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant ***." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007). Generally, the first step of plain-error analysis is to determine whether error occurred at all, which "requires a substantive look at the issue." (Internal quotation marks omitted.) *People v. Naylor*, 229 Ill. 2d 584, 593, 893 N.E.2d 653, 660 (2008). The instant issue—whether the trial court violated Rule 431(b)—is a question of law reviewed *de novo*. *People v. Thompson*, 238 Ill. 2d 598, 606, 939 N.E.2d 403, 409 (2010).

¶ 77          Rule 431(b) requires trial courts to read four principles of law to potential jurors and "ask each potential juror *** whether that juror understands and accepts" the principles; the method of inquiry employed by the trial court "shall provide each juror an opportunity to respond to specific questions concerning the principles ***." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Our supreme court has found that the language of the rule is clear and unambiguous, mandating "a specific question and response process." *Thompson*, 238 Ill. 2d at 607. The first step in that process is to "ask each potential juror whether he or she understands and accepts each of the principles in the rule." *Id.* Then, "the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.*

¶ 78          The trial court in this case conducted its Rule 431(b) inquiry as follows:

                    "THE COURT: Okay. Again, I do have to review the propositions of law
          with you so please listen carefully.

                    A person accused of a crime is presumed to be innocent of the charges
          against him. The fact that a charge has been made is not to be considered as any
          evidence or presumption of guilt against the Defendant.

- 20 -

The presumption of innocence stays with the Defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved the Defendant's guilt beyond a reasonable doubt.

The State has the burden of proving the Defendant's guilt beyond a reasonable doubt. The Defendant does not have to prove his innocence.

The Defendant does not have to present any evidence on his own behalf and does not have to testify if he does not wish to. If the Defendant does not testify, that fact must not be considered by you in any way in arriving at your verdict.

So by a show of hands, do each of you understand these principles of law?

PROSPECTIVE JURORS: (All raise hands.)

THE COURT: And do each of you accept these principles of law? Again, raise your hands.

PROSPECTIVE JURORS: (All raise hands.)"

¶ 79        We find the trial court followed the "specific question and response process" contemplated by *Thompson*. The court first read out loud the four principles enumerated in Rule 431(b). It then asked the prospective jurors, in separate inquiries, whether they understood and accepted those principles, thereby satisfying the "question" portion of the process. The prospective jurors responded in the affirmative—by raising their hands—that they understood and accepted the principles, thereby satisfying the "response" portion of the process. Rule 431(b) required nothing further. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012); *Thompson*, 238 Ill. 2d at 607. Accordingly, we conclude no error occurred and we honor defendant's forfeiture of this

argument. See *Naylor*, 229 Ill. 2d at 593 ("When a defendant fails to establish plain error, the result is that the procedural default must be honored." (Internal quotation marks omitted.)).

¶ 80                             III. CONCLUSION

¶ 81          For the reasons stated, we affirm the trial court's judgment.

¶ 82          Affirmed.